## Bernard E. Epton, Plaintiff-Appellant, v. The CBC Corporation, a Delaware Corporation, Arthur C. Allyn, Jr., and Artnell Company, a Delaware Corporation, Defendants-Appellees.

### Gen. No. 49,014.

First District, Second Division.

April 7, 1964.

Edward R. Johnston, James A. Sprowl, and Jerold S. Solovy, all of Chicago (Thompson, Raymond, Mayer & Jenner, of counsel), for appellant.

Thomas R. Mulroy, and Daniel Walker, of Chicago (Hopkins, Sutter, Owen, Mulroy & Wentz, of counsel), for appellees.

MR. JUSTICE FRIEND delivered the opinion of the court.

In this proceeding, plaintiff Bernard E. Epton seeks specific performance of an oral option agreement to buy control of the stock of the American League Baseball Club of Chicago, an Illinois corporation, known as the Chicago White Sox, or, in the alternative, asks

for damages for breach of the agreement. After several hearings, during which plaintiff amended his pleadings, the chancellor sustained defendants' motion to strike the amended complaint and entered a final decree dismissing the cause with prejudice, from which plaintiff appeals.

The amended complaint alleges in minute detail facts relating to the transactions between the parties. Since defendants' motion to dismiss admitted all the well pleaded allegations of fact in the amended complaint, the following salient facts are considered to be uncontroverted.

Count 1 alleges that on May 31, 1961 The CBC Corporation owned 2966 shares of the common stock of the Chicago White Sox, constituting fifty-four per cent of its issued and outstanding stock. The CBC stock in turn was entirely owned by Henry B. Greenberg, Mary Frances Veeck, the wife of Bill Veeck, and Artnell Company. Artnell was and is controlled by Arthur C. Allyn, Jr. With the knowledge, acquiescence, and consent of his wife, Veeck dealt with and represented the CBC stock held by her as though it were owned by him. For a long period of time prior to May 31, 1961 Veeck was president of CBC and Greenberg its vice president and treasurer. Veeck, Greenberg, and Allyn were directors of CBC, constituted a majority of the five-man board, and exercised complete control over all the affairs and acts of the corporation.

In early April 1961 Allyn informed plaintiff that CBC would sell its 2966 shares of the Chicago White Sox for $4,800,000. Allyn advised plaintiff that all negotiations should be conducted through him, and he gave plaintiff balance sheets and operating statements of the Chicago White Sox. Thereafter plaintiff organized a group of investors. Between early April and May 31, 1961, Allyn conferred with plaintiff by tele-

phone on several occasions with respect to the progress plaintiff was making in raising the necessary funds. On May 24, 1961 plaintiff informed Allyn that he was very close to raising the required amount and asked Allyn whether he would need to submit a formal offer of purchase. Allyn told plaintiff that his informal offer would be sufficient, and that " 'if you make me an offer, I assume you will stand behind it and that is good enough for me.' " By May 31, 1961, plaintiff alleges, he had commitments in excess of $4,800,000 from responsible persons.

It is alleged that on Wednesday morning, May 31, 1961, plaintiff went to Allyn's office and informed him that his group was prepared to make an offer of $4,800,000, that Allyn characterized this information as " 'wonderful news,' " and said that plaintiff's group could have the option for nothing. He also informed plaintiff that he would set up a meeting with Veeck and Greenberg. Pursuant to his direction plaintiff's counsel prepared an option agreement, using as a form the option contract which CBC had utilized some years before when purchasing the same 2966 shares from Dorothy Comiskey Rigney. One of plaintiff's counsel had been in communication with Veeck and is alleged to have been informed by him that plaintiff could have, for $1000, a one-week option to purchase the 2966 shares for $4,800,000.

On Wednesday evening, May 31, 1961, Allyn drove plaintiff to Veeck's apartment where they conferred with Veeck, Greenberg, and John Yonco, a lawyer and the assistant secretary of CBC, who was acting as CBC's legal representative at this meeting. Plaintiff's counsel were also present and submitted to the parties the option agreement which had been prepared; it provided that CBC grant plaintiff, for $1000, a twenty-eight day option to purchase the 2966 shares for $4,800,000. After plaintiff's attorneys and Yonco had

agreed to certain changes in terminology in the prepared option agreement, Greenberg stated that a twenty-eight day option was too long and suggested a four-day option. After discussion the parties compromised on a one-week option period. Greenberg also objected to the $1000 consideration; he regarded it as insufficient. Veeck was of the opinion that this amount was adequate in light of the fact that CBC had paid only a $100 fee for a two-month option when it had purchased the 2966 shares from Mrs. Rigney. The matter was discussed further, and the parties agreed to a $1000 consideration for a one-week option. The draft agreement was then reviewed, paragraph by paragraph, and various changes were made by the attorneys. After the option agreement had been further reviewed and revised, Veeck, Allyn, and Greenberg stated that all the terms had been fully agreed on, and plaintiff had a one-week option. They next discussed the fact that they would have to resign as directors of the Chicago White Sox, and reviewed the technicalities which should be observed. Following these discussions, plaintiff said that he would prefer a "clean" copy of the agreement to show his investors and suggested that the formality of actually executing the contract be deferred until the agreement could be retyped. Allyn, Veeck, and Greenberg acceded to this suggestion, but informed plaintiff that he had a binding one-week option commencing at midnight of that evening. At the conclusion of the meeting Veeck shook plaintiff's hand and said, " 'O.K., Bernie, . . . we have a deal. I am glad that's taken care of. I know you will do a good job.' " Allyn is alleged to have shaken plaintiff's hand and commented, " 'It is a fine deal. You won't be sorry.' " Greenberg also expressed his approval with a handshake, and congratulated plaintiff. On Thursday morning, June 1, 1961, plaintiff's attorneys, in retyping the option agreement, deter-

277

mined that they wished a change to be made in wording. When counsel called Yonco concerning this change, Yonco rejected it on the ground that the parties had a firm and binding agreement, the terminology of which was subject to neither change nor negotiation; accordingly the option agreement was retyped without alteration, and on that day delivered to Yonco for execution by the parties.

Early on Friday morning, June 2, 1961, one of plaintiff's counsel delivered to Yonco a check in the sum of $1,000, dated May 31, 1961, payable to the order of The CBC Corporation, along with a letter dated June 2, 1961 which stated: "In connection with the Option Agreement I am enclosing our check for $1,000, representing the consideration for the Agreement." This check was accepted by CBC. There are allegations in the amended complaint with respect to the proposed public announcement of the offer to purchase the Chicago White Sox stock. On Friday, June 2, 1961, Allyn asked plaintiff to come to his office and go through the motions of making an offer. When plaintiff arrived in Allyn's office about four-thirty in the afternoon, Allyn informed him that although Greenberg was being difficult, he and Veeck would see to it that CBC signed the option agreement and that the announcement of its signing would be made public on Monday, June 5, 1961. It appears that Greenberg was changing his mind, or had already decided not to sell his shares of the stock. The reasons for his apparent change of attitude do not appear of record. However, on Saturday, June 3, 1961, plaintiff informed Veeck that he stood ready, willing, and able to meet the terms and conditions of the option agreement by depositing the sum of $99,000. In reply to Veeck's query as to whether the Epton group could raise the necessary $4,800,000, plaintiff informed Veeck that not only did his group have commitments in excess of that amount but that they were exercising

278

their option. Plaintiff further told Veeck that he would not deposit the $99,000 until such time as CBC formally executed the option agreement, but he offered to deposit with Veeck a certified check in the amount of $100,000 to show good faith and his ability to perform. Veeck advised him that this was not necessary.

It appears that on Monday, June 5, 1961, Allyn commenced negotiations with Veeck and Greenberg for the purchase of all their shares of CBC stock. On the same day Allyn informed plaintiff that Greenberg was not willing to sign the agreement as yet. Late that same day CBC returned the $1000 check which it had previously accepted but not cashed. On Wednesday, June 7, 1961, Allyn informed plaintiff that Greenberg would not sign the option agreement and that CBC would not carry out its obligations thereunder. Plaintiff again informed Allyn that he stood ready, willing, and able to perform the agreement and demanded performance by CBC. Thereafter, on Saturday, June 10, 1961, Allyn through Artnell purchased from Greenberg and Mary Alice Veeck all their shares of CBC stock. Allyn thus caused Artnell to become the sole shareholder of CBC; nevertheless CBC and Allyn have ever since refused to perform the option contract.

In Count 2 plaintiff realleges substantially all the allegations of Count 1, represents that on May 31, 1961 and presently the 2966 shares of the Chicago White Sox have a fair market value of at least $5,-500,000, asks that defendants be held to specific performance of the terms and conditions of the option agreement, or that, in the alternative, if plaintiff is not entitled to the remedy of specific performance, a judgment for damages in the amount of $700,000, with costs, be assessed against defendants.

■ Paragraph 2 of the option agreement, which underlies the controversy between the parties, reads as follows:

279

"2. Buyer shall exercise this option by giving Seller notice in writing of his intention so to do, together with a certified or bank cashier's check payable to the order of The CBC Corporation in Chicago Clearing House funds in the amount of $99,000. The notice shall be given to Seller not more than one week after date hereof and shall specify a date of closing which shall be not less than 10 days and more than 21 days after the date of such notice. The closing shall take place at the office of Continental Illinois National Bank and Trust Company of Chicago at 10:00 a. m. on the date specified in the aforesaid notice (hereafter called the Closing Date). If not exercised within 7 days as aforesaid this option shall terminate and the parties shall be under no further obligation to each other hereunder."

The foregoing paragraph clearly stipulates two conditions: plaintiff was required within one week to give *written* notice of exercise, and was required within the same period to give CBC a certified or bank cashier's check in the amount of $99,000. Neither condition was fulfilled, and defendants urge that plaintiff's failure to comply with the terms of the agreement precludes him from bringing a successful action to enforce the option agreement under Count 1 or to obtain an award in damages under a breach thereof under Count 2.

There is no issue of fact on this point. The amended complaint does not allege that written notice of exercise was ever given. The only allegations germane to notice of exercise are from the twenty-third paragraph of both counts:

"23. On Saturday, June 3, 1961, plaintiff informed Veeck that he stood ready, willing and able to meet the terms and conditions of the

option agreement by depositing the sum of $99,-000.00 as required by said agreement, and requested that CBC formally sign the option agreement. Veeck asked plaintiff if plaintiff's group could raise the necessary $4,800,000.00 to exercise the option, and plaintiff informed Veeck that plaintiff's group had commitments in excess of $4,800,000.00 and were exercising their option, but that they would not deposit the $99,000.00 until such time as CBC formally executed the option agreement. . . ."

This raises the issue whether oral notice of intent to exercise is sufficient where the option agreement admittedly calls for written notice and also whether plaintiff's oral notice was ineffective because it was coupled with (a) a condition that the agreement be executed, and (b) a repudiation of one of the key terms of the agreement, i. e., that plaintiff deliver with the notice a certified or cashier's check for $99,000. The question is also raised whether the alleged repudiation by defendants on June 7, 1961, the last day of the one-week option period, operates to excuse the requirement of written notice.

The law pertaining to option agreements is fairly well settled in Illinois. An option agreement is a unilateral agreement governed by rules of law entirely distinct from those applicable to bilateral contracts. The reason for this key distinction was stated by the Illinois Supreme Court in Lake Shore Country Club v. Brand, 339 Ill 504, 521–22, 171 NE 494 (1930), as follows:

"An option contract is unilateral. Under it the optionee has a right to purchase upon the terms and under the conditions therein named. He is not, however, bound to purchase. Because but one party is bound thereby and the other is not, courts

will exercise their discretion with great care in determining whether such a unilateral contract has been converted into a bilateral contract. . . . If conditions precedent to the right to convert a unilateral contract into a bilateral one are not met the unilateral contract does not become bilateral. . . . An option contract is not a contract of sale within any definition of the term, and at best but gives to the option holder a right to purchase upon the terms and conditions, if any, specified in the option agreement. In order to avail himself of the right the optionee must comply with the conditions set out in the option contract. . . ."

In 4 Williston on Contracts, Third Edition, section 620 (1961), the author makes the following comment (753): "When contracts are optional in respect to one party, they are strictly interpreted in favor of the party bound and against the party that is not bound . . ." (Footnote omitted.) In 1A Corbin Contracts, section 260 (1963), the author suggests (466) that because of the freedom of an optionee to demand or not demand performance at will, he wields great power and "his option or freedom of choice is wholly unlimited." (Footnote omitted.) In the case of Clark v. Muirhead, 245 Mich 49, 222 NW 79 (1928), the Michigan Supreme Court said:

"In James on Options, § 839, the author points out the distinction between an election to be bound by the option and acts in the performance thereof; that the latter 'are merely matters of performance of the contract raised by the election, the sufficiency and timeliness of which are tested by the rules of law relating to the performance of contracts generally and not by the rules of law peculiar to the acceptance of offers.' "

282

Some years ago, in Van Meter v. Downing, 345 Ill App 605, 104 NE2d 126 (Abst 1952), we had occasion to consider the question here presented. In that case we held that an allegation that the optionee was ready and willing to perform an option to purchase realty without alleging that such attitude had been communicated to the optionors was insufficient to show exercise or acceptance of the option so as to state a cause of action for breach of the option by the optionors who sold the realty to another before expiration of the option. We relied strongly on the Lake Shore Country Club case, from which we quoted as follows:

"... '... An option contract is not a contract of sale within any definition of the term, and at best but gives to the option holder a right to purchase upon the terms and conditions, if any, specified in the option agreement. In order to avail himself of the right the optionee must comply with the conditions set out in the option contract. ... An option contract does not come within the equitable rule against forfeitures. The question of declaring a forfeiture is not involved. An option contract gives to the optionee a right under the named conditions. If those conditions are not met the optionee does not acquire the right. Such a situation involves none of the elements of a forfeiture. It deprives no party of any right and abrogates no contract, but, on the other hand, is but the enforcement of the contract made by the parties. ... A court of equity cannot relieve the optionee from the effect of his failure to comply with the conditions on which he has been granted the privilege of buying. This would make a new contract for the parties and compel the owner to sell when he had not agreed to do so. ...' "

It will be noted that in the Van Meter case the plaintiff did not comply with the conditions of his option; he gave no notice where oral notice was required. In the instant proceeding plaintiff did not comply with the conditions of his option; he gave oral notice where written notice was specified and failed to pay the $99,000 provided for in the contract.

In the Lake Shore Country Club case the facts were stronger for the optionee-plaintiff. The optionee and the optionors executed a written lease on the same day that the option to purchase the leased property was granted. The court held that where the covenants of a lease are to be performed as a condition to the exercise of an option to purchase, given in the lease, the optionor has the right to refuse to enter into a contract of sale where there is a default in any covenant of the lease the breach of which he has not waived, and there is no obligation on his part to notify the optionee of his defaults in the condition of the option contract, notwithstanding the lease provides a specified time after notice of defaults in which to correct them. "We are of the opinion," said the court (524), "that as the appellee [optionee] was in default, in the manner hereinbefore specified, at the time it gave notice of its election to purchase, it has not met the conditions precedent to its right to exercise the option. No cases cited by appellee lay down a different rule."

We find no cases in plaintiff's brief which hold that where an option contract requires written notice of exercise, an oral statement of intent is sufficient to convert the unilateral contract into a binding bilateral contract. To hold that oral notice is sufficient would be to flout the rule of strict compliance with the conditions precedent. The rule in the Lake Shore Club case is followed in Morris v. Goldthorp, 390 Ill 186, 60 NE2d 857 (1945), where, under the language of the

284

option, the optionee, upon acceptance thereof, was entitled to demand a deed conveying fee-simple title subject to certain unpaid taxes which the optionee was to pay, and a conveyance by quitclaim deed would have been sufficient to convey such title. The court held that the optionee's demand for a conveyance by warranty deed, which was silent as to taxes and the effect of which would have made optionors' warrant title as being clear of certain taxes, was not an acceptance of the option according to its terms and amounted to a mere counteroffer. The court said (195):

> "It is elementary that where one party gives an option to another, the acceptance, to be valid so as to conclude an agreement or contract between the parties, must, in every respect, meet and correspond with the offer, neither falling short of, nor going beyond, the terms proposed, but exactly meeting them at all points and closing with them just as they stand. [Citing cases.]"

Aside from the failure to give written notice for the exercise of the option, there remains the failure of plaintiff to deliver a check payable to CBC for $99,000. He sought to excuse this failure by alleging that he offered to deposit a certified check in the amount of $100,000 with Veeck "to show his good faith," but we think the rule governing options does not allow plaintiff to choose to do something other than the contract requires. In point on this issue is Hart v. California Pac. Title & Trust Co., 136 F2d 430 (9th Cir 1943), where the optionee's failure to pay $10,000 required to be given with the notice of exercise of the option was held to defeat an action for specific performance. To the same effect is Storm v. Storm, 22 Ill App2d 140, 159 NE2d 14 (Abst 1959), wherein the court relied on the Morris case. Under a divorce decree giving the wife an option to purchase

from the husband jointly owned real estate for the sum of $10,000 at any time within ninety days from the entry of the decree, the court in the Storm case held that proper tender by the wife was a condition precedent to the option's ripening into a contract, and that the giving of notice by the wife to the husband of her intention to repurchase the property within the time limit of the option, with a deposit of $10,000 by a third person, in an escrow of which the wife was not a beneficiary and by the terms of which she might never obtain title, and which contained new conditions not agreed to by the husband, was not a proper exercise of the option.

It is evident from the allegations of the amended complaint that plaintiff did not rely on the alleged repudiation to excuse compliance with the conditions of the agreement. Although he was on notice that Greenberg, a key party, was refusing to go along with the option, plaintiff still did not give written notice or pay the required $99,000; rather, he insisted that defendants sign the option agreement, thereby evidencing his uncertainty as to whether there was in fact any binding agreement. The situation here illustrates the wisdom of the established rule which eliminates uncertainty by requiring strict compliance with the terms of the agreement. This is recognized in the Morris case in which it was pointed out (196) that "courts have no authority to compel a party to do something different from that which, by his contract, he has agreed to do."

Plaintiff relies heavily on Martindell v. Lake Shore Nat'l Bank, 15 Ill2d 272, 154 NE2d 683 (1958). This case involved a financing agreement for Marquis-Who's Who, Inc., under which plaintiff agreed to advance certain funds. The agreement was executed and the funds were advanced, so that the agreement was bilateral and thus binding on both parties. The

286

financing agreement gave plaintiff an option to buy sixty-seven per cent of the debentures and stock of the corporation, with the provision that plaintiff give at least thirty days' advance written notice of intent to exercise. Plaintiff did give the required written notice electing to exercise the option but failed to give thirty days' advance notice. It thus appears that the defect was not failure to give written notice but failure to specify a date at least thirty days thereafter on which the option would be exercised. The court was not faced with the question involving the act required to convert a unilateral contract into a bilateral agreement. The controversy arose over failure to specify a date, an act which the court found "useless" in view of the defendants' attitude of repudiation of the bilateral contract.

Various other points are raised by the respective parties, including defendants' contention that the Statute of Frauds (Ill Rev Stats 1963, c 59) bars recovery. This involves the question, which the chancellor regarded as a question of law, whether the $1000 check was "accepted" by defendant so as to take the agreement out of the statute. However, we think the rule with respect to the exercise of option contracts heretofore discussed, wherein the courts and the authorities generally hold that option contracts are unilateral in nature and therefore different from bilateral contracts, is controlling, and makes it unnecessary for us to consider the Statute of Frauds.

■■ In Count 2, as an alternative to his prayer for specific performance, plaintiff seeks damages by reason of defendants' alleged breach of the option agreement. His counsel rely primarily on Schmidt v. Beckelman, 9 Cal Rptr 736 (Cal Dist Ct of App 1961). There the optionor notified the optionees, before the end of the six-month period, that he was rescinding the option agreement to purchase mining property and

287

would accept no further payments. The two $100 checks given as monthly payments to keep the option alive were returned, uncashed, to the optionees. The optionor sued to have the option declared void, while the optionees counterclaimed to recover damages. Both complaints were filed prior to the expiration of the ultimate time limit within which the optionees might have given notice of their election to exercise the option and to tender the total purchase price required thereunder. The evidence showed that the attempted rescission of the option was unequivocal; there was no evidence that the optionees ever notified the optionor that they were prepared to elect or did elect to exercise their option, or that they had notified the optionor that they had the money with which to meet the ultimate terms of the final purchase price. But the opinion contains no real discussion of the theory advanced by plaintiff here—that an action for damages for breach of a unilateral contract can be maintained in the absence of exercise. The court there stated that its research disclosed no cases discussing the measure of damages for repudiation by an optionor in the absence of an exercise by the optionee. While holding that the award of damages to the optionees was excessive, the court did recognize in rather vague language that the optionees might be entitled to some damages, but it was quite uncertain as to how they could be computed. With respect to the notice of exercise, the court held (740–41):

". . . some notice either orally or in writing or by some act is required of the optionee to the optioner [sic] that the optionee does, in fact, elect to exercise the option, unless the option itself provides a specific form of notice. Whatever method the optionee uses to convey to the optionor knowledge that the optionee does, in fact, elect to exercise the option, it must convey the informa-

288

tion to the optionor that the option is, in fact, exercised, and the acceptance must correspond with the offer, meeting the offer at all points as it is made. . . ."

While the optionees failed to give notice of exercise, they did make the required monthly option payments. This is in contrast with plaintiff's admission in the amended complaint in the instant case that he would not pay to CBC the $99,000 required by the agreement to be paid simultaneously with notice of exercise. This fact alone distinguishes the California case and places the plaintiff here in a position where he has no right to seek damages for repudiation of the option. It should be noted that in the California case the court merely reversed the judgment of the trial court in favor of the optionees; it did not remand the cause for evidence as to damages.

However, there is precedent in Illinois for the disallowance of damages in a situation of this kind. In the Van Meter case the complaint asked damages on an option which plaintiff never exercised or accepted and under circumstances where he never advised defendants that he was ready and willing to buy, but this claim was disallowed, for "the authorities," we said, "are generally in accord that an option is unilateral; it must be exercised or accepted before suit may be brought thereon."

A case precisely in point is Hultberg v. City of Garrison, 79 ND 356, 56 NW2d 319 (1953). There the agreement provided that the city, in consideration of the payment of $400 by the plaintiff, would hold two described lots for her up to a certain date and would transfer the property to her at any time within the prescribed period after completion of the payment of $1600, provided further that within the prescribed period written notice of exercise of the option be delivered to the city auditor and a substantial com-

289

mencement—at least five per cent of the whole—of construction of a fireproof theater be made on the said property. The plaintiff sought to excuse her failure to comply with the conditions of the option by attempting to prove what she claimed to be a breach of the terms thereof by the city prior to the expiration of the time of performance of the conditions by the plaintiff—principally that the city council passed a resolution to issue no permits to make connections to water and sewer mains on Main Street for a period of five years, thus preventing her from performing the conditions of the option. The court held, relying on the Clark case among others, that the plaintiff could neither recover damages for failure of the defendant to convey nor complain of any breach or repudiation by the defendant where the instrument sued upon was merely an option and where the plaintiff, by her own testimony, had not done or attempted to do the acts required to convert the option into a contract of purchase and sale.

We are of opinion that the chancellor here properly allowed the motion to strike the amended complaint and dismiss the suit. The decree of the Superior Court is therefore affirmed.

Decree affirmed.

BURKE, P. J. and BRYANT, J., concur.