Crest Finance Company, Inc., Plaintiff-Appellant, v. First State Bank of Westmont, Defendant-Appellee.
Federal Deposit Insurance Corporation, as Receiver for the First State Bank of Westmont, Intervenor-Appellee, v. Leo Niederberger, Third Party Defendant-Appellant.

Gen. No. 50,169.

First District, First Division.

January 7, 1966.

Rehearing denied February 3, 1966.

Kirkland, Ellis, Hodson, Chaffetz & Masters, and Rappaport, Clorfene & Rappaport, all of Chicago (Don H. Reuben, John E. Angle, Craig W. Christensen, and Hamilton Clorfene, of counsel), for appellants.

Taylor, Miller, Magner, Sprowl & Hutchings, of Chicago (John S. Miller, James J. Magner, E. Marvin Buehler, William M. Moroney, and Leslie H. Fisher, Washington, D. C., of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Cook County which dismissed, for want of equity, a complaint in chancery filed April 30, 1963, whereby plaintiff sought a decree directing the defendant bank to deliver to plaintiff commercial paper and collateral of a face value of approximately $900,000.

On May 16, 1963, Joseph E. Knight, Director of the Department of Financial Institutions in the State of Illinois, took possession of the defendant bank, and on May 24, 1963, filed a complaint in the Circuit Court of DuPage County for its dissolution. On the same day, Federal Deposit Insurance Corporation was appointed receiver of the defendant bank. On June 25, 1963, the receiver was granted leave to intervene in the instant cause and to file its intervening petition. Leave was also granted to the receiver to make Leo Niederberger a third-party defendant.

The pleadings consist of a complaint, answer of the defendant bank, reply of the plaintiff thereto, and the intervening petition of the receiver.

Plaintiff, Crest Finance Company, is an Illinois corporation, engaged in the business of making loans to small businesses. Crest's borrowers sign promissory notes and, as collateral security for their loans, assign chattel mortgages, accounts receivable, conditional sales con-

366

tracts, or similar commercial paper. Third-party defendant, Leo Niederberger, is president and treasurer of Crest and, with his wife, owned all of its outstanding stock. In order to secure funds for Crest by loans from Chicago area banks to Crest, Niederberger personally guaranteed in excess of $900,000 of Crest indebtedness to these banks. He had also agreed with the banks that none of the commercial paper held by Crest would be pledged by Crest as security.

Early in March, 1963, Niederberger decided he would sell ownership of Crest. Lester Brock was introduced to Niederberger as a potential purchaser of Crest by a business broker, Otto Stephani. Brock was a business man and a stockholder in defendant, First State Bank of Westmont. He was also manager of a corporation known as State Street Securities, a company owned by Norman Weaver and Lawrence Stickell. Weaver and Stickell were also the principal owners of the First State Bank of Westmont, having acquired control of the Westmont Bank in February, 1963. Stickell was a director of the bank, and Weaver was chairman of its board.

Throughout his negotiations with Niederberger, Brock represented that he was acting for others, but he never disclosed their identity. He testified later that Stickell was in fact his principal, and that Weaver also had knowledge of the transaction.

On April 2, 1963, an offer to purchase agreement, dated March 30, 1963, was entered into by Niederberger and Brock. Brock agreed to (1) pay Niederberger $600,000 for all of the outstanding shares of Crest stock which stood in the name of Niederberger and his wife; and (2) substitute Brock's personal guarantee for Niederberger's on $900,000 of Crest promissory notes held by Chicago banks, which previously had been personally guaranteed by Niederberger. In the alternative, Brock was to pay off the total bank indebtedness and

eliminate Niederberger's "liability on any and all of such items." The selling price was arrived at as follows: ·

| | |
|---|---|
| Book value | $250,000 |
| Reserves | 80,000 |
| Unearned income | 120,000 |
| Good will | 150,000 |
| Total | $600,000 |

Niederberger agreed "to execute or cause to be executed all documents necessary to consummate the sale of the said stock, and all matters coincidental." Niederberger was to "continue to operate the business of Crest Finance Company, Inc., in the same manner as heretofore," in cooperation with the buyer for at least three months, at a salary of $1,000 per month.

The agreement was executed at Crest's office on April 2, 1963. Present were Brock, Niederberger, Stephani (the broker), Hamilton Clorfene (Niederberger's lawyer) and Wayne Willard (Westmont's executive vice president and cashier). Willard testified that he participated in the meeting under the instructions of "[t]he Chairman of the Board, Mr. Weaver, and Mr. Stickell, a Director." Willard had brought four blank Westmont Bank drafts on Chicago banks. At Niederberger's direction, Willard made three of the drafts payable to Niederberger and inserted amounts totaling $600,000. The Crest stock was not endorsed, transferred or delivered to Brock at that time, but was placed in escrow with Niederberger's lawyer, to be held until such time as Brock had either substituted himself as guarantor or paid off all the $900,000 bank loans on which Niederberger was secondarily liable. The escrow receipt, dated April 2, 1963, and signed by Hamilton Clorfene, was as follows:

"The undersigned hereby acknowledges the receipt of three stock certificates for a total of Seven

368

Hundred Fifty Shares of the common stock of Crest Finance Co., Inc., an Illinois corporation, . . . . The undersigned agrees to hold the stock as escrowee under the following condition: Upon written advice from Leo Niederberger that he has been released from all personal liability as guarantor of Crest Finance Co., Inc., the undersigned agrees to deliver all of the said stock of Crest Finance Co., Inc. to Lester A. Brock."

On April 2, 1963, shortly after receiving the drafts totaling $600,000, Niederberger left the meeting at Crest's office to go to the Irving Bank to deposit the drafts in his personal account. During his absence, Brock and Willard then took approximately $800,000 of commercial paper from Crest's office and removed it to the Westmont Bank.

On April 3, 1963, Willard, together with an assistant, returned to the Crest offices and remained there the entire day. He testified that both Mr. and Mrs. Niederberger were there on the 3rd, and that Niederberger helped Willard remove some of the commercial paper, and by the end of the 4th of April, Willard had taken to Westmont "roughly a million dollars worth of paper," although he did not stop to audit it at that time. Willard left some receipts for part of the collateral, bearing the inscription "Received—Bank of Westmont—Wayne Willard." Niederberger was at the Crest office only briefly during these several days. He observed Willard photostating some documents and met with several customers of Crest. He testified that he thought it was the credit files that were being removed for audit, and that he specifically told Willard and Brock not to remove the commercial paper. It was about April 15, 1963, when he learned for the first time that "the First State Bank of Westmont was in possession of documents or securities which had been or was the property of Crest Finance Company."

On the evening of April 2, 1963, Weaver, Stickell and Arvin Brackmann held a Westmont directors' meeting and under date of April 2, 1963, authorized the "purchase" by the bank of $957,000 installment paper from Crest Finance Company, "with proper guarantee of payment to be made by Crest Finance Company." This authorization was matched by an "offer for sale" by Crest, signed by Brock, as "President" of Crest, under date of April 2, 1963.

On the afternoon or evening of April 4, 1963, Brock convened what purported to be a meeting of Crest stockholders in the lobby of the bank at Westmont. The only participants in the meeting were Brock and Jack E. Sohr (a friend). Brock, Sohr and Sandra Kay Ryan (Brock's secretary) were elected directors of Crest. Then, as directors, Brock and Sohr elected Brock, president, Sohr, vice president and treasurer, and Helen Ware, secretary of Crest. Helen Ware had previously been an employee and the secretary of Crest, but she was not informed of her "reelection."

At the same purported special meeting of the Crest board of directors, resolutions were adopted (1) authorizing the president to sell as of April 2, 1963, to the First State Bank of Westmont, "accounts receivable belonging to this Company in an amount not to exceed One Million ($1,000,000.00) Dollars, . . . ," and (2) "that the Secretary of this Company be and she is hereby directed to accept the shares of stock of this Company, outstanding in the name of Leo Niederberger and to issue in their place a certificate representing a like number of shares in the name of Sandra Kay Ryan." Minutes of these purported stockholders' and directors' meetings of Crest Finance Company are dated April 2, 1963, and are in evidence.

On the same evening of April 4, on behalf of plaintiff Crest, and as its president, Brock signed and delivered to the Bank of Westmont a written offer dated April 2,

1963, to sell "certain promissory notes secured by assignments of accounts receivable, notes and mortgages" for the "purchase price $957,000." The offer further agreed to deliver to the bank "the original of each and all notes" and "all notes will be assigned to the First State Bank of Westmont with payments being guaranteed by Crest Finance Co., Inc." The offer further shows, "Accepted: First State Bank of Westmont, By: Norman H. Weaver." Brock also signed and delivered to the bank certain assignments of the commercial paper here in controversy. It is these assignments that plaintiff Crest contends are invalid.

Of the proceeds of the $957,000 purchase authorization of April 2, 1963, and by ledger entries, $600,000 was immediately used to offset the Westmont drafts for $600,000 given by Willard earlier that day to Niederberger. The remaining $357,000 was deposited in a checking account at the Westmont Bank entitled "Crest Finance Company," by a deposit slip dated April 3, 1963. Of the $357,000 "Crest Finance Company" account at Westmont, $335,162 was used to pay personal obligations of Stickell, Weaver and Brock by cashier's checks issued by the Westmont bank and offset by "Crest Finance Company" checks on its account at that bank, signed by "Lester A. Brock, President." These transactions took place between April 4 and April 17, 1963. When the receiver took over the bank, the balance in the "Crest Finance Company" account of $20,520.73 was appropriated by the receiver.

Brock testified that between April 5 and April 22 or 23, 1963, he and Niederberger called on twenty various banks in an attempt to substitute Brock for Niederberger and eliminate Niederberger's liability on the Crest bank loans. Niederberger introduced Brock in several ways: as the "new owner of Crest Finance," as "the new President of Crest Finance Co.," or as "the man who would be the new President of Crest Finance Co."

Niederberger denied that he introduced Brock as "the new President" of Crest.

The first bank to be visited was the Exchange National Bank. This was five days after the Brock-Niederberger deal and after the commercial paper or collateral had been delivered to Westmont. Brock had maintained a checking account at this bank for many years. At the Exchange National Bank arrangements were made by Brock and Niederberger for the renewal of a Crest loan in the amount of $100,000, endorsed by Niederberger personally and which was to fall due on April 8, 1963. The loan was renewed and the renewal note was signed by Niederberger, as president of Crest. Brock endorsed the new note personally. The note at the Exchange National Bank was the only Crest note renewed and extended by any bank during this particular period and before the Westmont bank was closed by action of State authorities.

On April 15 or 17, Brock and Niederberger met with Walter Stern, board chairman of the Irving Bank of Chicago. At that time, Brock told Stern that he had removed Crest collateral "for examination and audit." He also told him that ". . . because of the time of the month here it was very difficult to get auditors to do any work at a time which coincided with filing of income tax returns; and that the collateral had been removed to the bank so it would be under our custody and we would have something in hand for the amount of money paid for Crest Finance Company." Stern then told him that he had had a conversation with Mr. Willard of Westmont and that he (Stern) told Willard, "I am disturbed as to what is going on here, and I think you should—to me he said: 'I think you should be very disturbed, too,' and 'that I want the loan to my bank paid immediately.' "

On April 18, 1963, Brock paid to the Westmont Bank $135,000 for the release to Crest of an equivalent amount

of paper. This left the Westmont Bank with $822,000 outstanding of the original $957,000 disbursed. The bank also had in its possession approximately $20,000 in the Crest Finance Company account, which was taken over by the receiver, leaving a net amount of about $800,000 wrongfully disbursed Westmont Bank funds.

On April 19, 1963, Niederberger's attorneys sent a registered letter to Brock and the First State Bank of Westmont, "making formal demand upon this bank by special delivery letter for the immediate return of this collateral which is being held without any color of title." No collateral was returned in response to the demand, and the instant suit was filed April 30, 1963.

After the suit was filed, Niederberger continued to operate and manage Crest. Niederberger was never relieved of his personal guarantees to the banks for Crest's indebtedness. On behalf of Crest, Niederberger collected $605,882.46 due on the commercial paper in controversy and held by Westmont, and applied this money to pay Crest's bank loans. The collection was without the consent of Westmont or its receiver. This reduced Crest's indebtedness and Niederberger's exposure as guarantor.

The entire matter was referred to a master in chancery for hearing and "his conclusions of law and fact." The master found for Westmont and against Niederberger and Crest on all issues. Also, the master found that Niederberger on May 16, 1963, caused to be formed the Pearson Securities Company and transferred Crest assets of about $750,000 (commercial paper) to the newly created corporation. The master further found that all of the capital stock of the Pearson Securities Company is owned by Niederberger, and that Niederberger "appears to have personally guaranteed the obligations of said Pearson Securities Company in order to enable Pearson to finance such transactions." We note here that Niederberger, by the terms of the purchase agreement

373

with Brock, "agrees not to engage in the finance business as an owner or principal in the City of Chicago for a period of three years."

The decree entered confirmed and sustained the master's report in all respects except that part of the report "wherein, in substance, said Master held that the equitable title to said shares of Crest Finance Company, Inc., purchased by Brock is now in the Intervenor as Receiver." This left open the ultimate question of ownership of the stock.

Also, the decree found that the receiver of the defendant bank was entitled to retain possession of the commercial paper. Plaintiff Crest and third-party defendant, Leo Niederberger, were decreed to be jointly and severally liable to the receiver for the sum of $605,-882.46, collected by them on the collateral securities after the filing of the complaint and during the time the cause was on hearing before the chancellor.

On appeal, it is the theory of Crest and Niederberger "that there never was a valid sale of the disputed collateral to Westmont by anyone. Accordingly, neither Crest nor Niederberger is liable to Westmont [now the FDIC] for the $605,000 in payments Niederberger collected from the debtors of Crest and applied to Crest's obligations." In support of their theory, Crest and Niederberger contend: (1) Brock's acts conferred no rights in Crest's assets upon the bank. Brock had no actual or apparent authority to deal with Crest's assets. (2) Westmont would be defrauding Crest's creditors if it bought Crest paper from Brock. (3) The Bank of Westmont has no rights in Crest collateral under the "two innocent parties" rule.

Although Niederberger contends that he never parted with the legal or equitable title to Crest stock, he asserts that the partially performed purchase agreement should be completed and "as soon as Niederberger is relieved of his remaining $195,000 in personal guaranties, he

374

should convey the Crest stock to whatever party is adjudged entitled to the purchaser's rights under the Crest sales contract. Niederberger thus seeks only the benefit of his bargain with Brock and has always stood ready and willing to deliver the Crest stock as soon as his guaranties are relieved."

The receiver's theory of the case consists of two major propositions, each of which is independent of the other: *"First:* Where one of two innocent persons must suffer loss by reason of the wrongful acts of a third party, the rule is universal that *the party who has made it possible, by reason of his negligence, for the third party to commit the wrong, must stand the loss.* In this case Niederberger's failure and the failure of other corporate officers, on the late afternoon of April 2, 1963, and on succeeding days, to take steps to put a stop to the transfer of securities from the Crest office to the Bank constituted such negligence. *Second:* That the transfer of the securities in controversy to the Bank was authorized by the person who was then the equitable owner of all Crest shares and in substance the owner of all the assets."

The Receiver also contends that, in the event this decree should be reversed and the Receiver directed to deliver up the property in dispute to the plaintiff, "that under that decision the *result* would be the same as if Niederberger *never* sold his stock. He should then be directed to return to the Receiver the sum of $600,000. To grant the relief requested by reversing the decree below and to permit him also to retain the money that came to him from the Bank would permit his unjust enrichment. He may not retain the purchase price and have control of the corporation and its assets in addition."

█ Initially, we note "[w]ithout regard to the findings of the master on any particular question of fact, the final question in this court is, Was the decree ren-

dered by the court a proper one under the law and evidence?" Zilvitis v. Szczudlo, 409 Ill 252, 255, 99 NE2d 124 (1951).

After examining this record at length, we consider the determinative issue to be whether Brock acquired the legal or equitable title to Niederberger's shares of stock in Crest. If Niederberger retained the legal and equitable ownership of his stock after the payment to him of $600,-000 by the Westmont Bank, Brock was without authority to sell and assign Crest's commercial paper to the Bank of Westmont.

The offer to purchase agreement executed April 2, 1963, and the testimony of the parties show that Niederberger was to receive (1) $600,000, and (2) the "elimination" of his liability on his personal guarantee of Crest bank loans approximating $900,000. The $600,000 was paid by bank funds which did not belong to Brock at any time or in any fashion. The bank never loaned any money to Brock nor did it pay out any money in his behalf. The $600,000 came from the bank as part of the purchase price of a fictitious sale of commercial paper, details of which were completed after the $600,000 had passed directly from the bank to Niederberger.

The second part of Brock's agreement called for the "elimination" of Niederberger's liability on the $900,000 bank loans, and the unendorsed stock certificates were placed in escrow with Clorfene for future delivery by him to Brock. Delivery of the unendorsed stock was conditioned upon "written advice from Leo Niederberger that he has been released from all personal liability as guarantor of Crest Finance Co., Inc."

██ As the transaction contemplated and provided for a future delivery of the stock, it should be deemed an executory contract of sale. In 30A CJS, Escrows, it is said:

376

Section 9:

"Until the performance of the condition, or the happening of the event, on which delivery is to be made by the depositary, the legal title to land to be conveyed by the instrument, or to other matter placed in escrow, remains in the grantor or depositor, and it is generally held that no title, estate, or interest vests in the grantee; . . .

"The general rule that title remains in the depositor has been applied to personal property generally, . . . and stock certificates." (Pages 993, 994, 995.)

Section 10 states in part:

"Where an instrument is deposited as an escrow, it cannot become operative until the conditions on which it is deposited have been performed or the contingency agreed on has happened, . . . . [B]efore a grantee or obligee may assert any rights under an escrow contract, he must show that he has complied with the conditions of the escrow, . . . .

"Generally, courts hold the parties to an escrow agreement to a strict compliance with the terms and conditions imposed. The doctrine of substantial compliance generally is inapplicable to escrow agreements. A part performance has no effect on the status of the instrument; and entire performance of the condition is necessary." (Pages 996, 997, 998.)

See, also, Corwin v. Grays Harbor Washingtonian, 151 Wash 583, 276 Pac 902, 903 (Wash, 1929), where it is said:

"There was no delivery of the stock to respondent, and under the circumstances the general rule applies that, in cases where the transaction contem-

plates or provides for a future delivery of the subject-matter thereof, it will ordinarily be deemed an executory contract of sale."

■ ■ We are aware of the basic equitable principle that equity regards as done that which ought to be done (Shay v. Penrose, 25 Ill2d 447, 449, 185 NE2d 218 (1962)), but we do not believe that principle applies here. This transaction manifests the intention of the parties to be that Brock was not to have ownership or title to the Crest stock until the happening of an event which never came to pass. We conclude that Brock had neither the legal nor equitable title to the stock here involved.

■ As Brock had no legal or equitable authority to or under the Crest stock, it follows that the meeting called by Brock of the purported Crest stockholders in the lobby of the bank at Westmont, and any action taken at the time by the purported stockholders, was a nullity. Therefore, the election of the new board of directors of Crest and the election of Brock as its president were nullities, also. Any documents, including the assignment of Crest's commercial paper, signed by Brock as its president, were void and of no legal force and effect. The bank acquired no right of ownership to the commercial paper in controversy through any document or act of Brock. The bank took possession of the paper through a fraudulent conspiracy developed by the bank's principal officers and directors. In turn, Niederberger had received $600,000 of the bank's money as the result of a fraud on the bank, performed by its officers. In substance, no money was ever paid for the stock. The $600,000 was disbursed by Willard on behalf of Westmont to purchase commercial paper never validly assigned to the bank.

The scheme was a fraud on both Niederberger and the bank. Niederberger received $600,000 of fraudulently

378

disbursed bank funds and was left obligated to pay off Crest bank loans of $900,000. The Crest commercial paper offsetting the bank loans was in the possession of the Westmont Bank, and without any obligation of Westmont to use the proceeds of the commercial paper to pay off the Crest bank loans. Niederberger stood to lose (1) $900,000: the $600,000 received by him from the Westmont Bank and $300,000 additional needed to pay off the balance of the $900,000 Crest bank loans; and (2) his Crest stock. Brock and his co-conspirators would have had (1) the $357,000 excess over the $600,000 bank funds paid to Niederberger; and (2) the Crest stock.

When the manipulations ended, Niederberger had $600,000 of the bank's money, to which he had no legal or equitable title, and the bank had $900,000 of commercial paper, to which it had no legal or equitable title or right of possession. At that point, the practical solution would have been for Niederberger to return to the bank the wrongfully disbursed $600,000 and for the bank to return to Crest the commercial paper wrongfully taken from Crest by stealth and with void assignments. The subsequent events prevented this.

The present status of the bank and its officers and Brock makes it impossible to restore either the bank or Niederberger to their preagreement postures. The bank is in liquidation. Lester Brock, Lawrence Stickell and Norman Weaver have been found guilty in a federal court of conspiracy to defraud and misapply funds of the Bank of Westmont (United States v. Stickell, et al., No. 64CR84, ND Ill June 30, 1965). The indictment to which Brock and Stickell pleaded guilty, and on which Weaver was found guilty after trial, charged them with disbursing $600,000 fraudulently in the purchase of commercial paper and in making false ledger sheet entries to show deposit of $357,000 on April 5, 1963, in an account headed "Crest Finance Company," when they "well knew

said Crest Finance Company did not cause to be deposited with the First State Bank of Westmont on said date the sum of $357,000.00."

Both sides cite the rule, "Where one of two innocent parties must suffer by reason of a wrongful act of another the one should bear it who made it possible for it to occur. . . . The basis of the rule is that there must be two innocent parties. The one who seeks the application of the rule must have used due diligence in the matter and exercised reasonable care to avoid the conditions which gave rise to the injury." Alton Banking and Trust Co. v. Alton Bldg. & Loan Ass'n, 289 Ill App 177, 190, 6 NE2d 921 (1937); Bartlett v. First Nat. Bank of Chicago, 247 Ill 490, 93 NE 337 (1910); Decatur Lumber & Mfg. Co. v. Crail, 350 Ill 319, 183 NE 228 (1932).

Niederberger asserts that he is "an innocent party," and that he "clearly acted reasonably and prudently, caused no harm or loss to anyone and is simply the victim of a confidence game. . . . Crest Finance Company is the lawful owner of the disputed collateral now in the possession of the Bank of Westmont; neither Leo Niederberger nor Crest Finance Company is liable to the FDIC for the $605,000 collected on the disputed collateral and paid to Crest creditors."

The following remarks of the chancellor demonstrate that he was skeptical of Niederberger's innocence or prudence during the period the commercial paper was being taken from the Crest Finance office by Willard:

> "Here is Willard holding the keys to the vault or the files. Here is Willard going right through it. Here is Willard removing them, taking them out, taking them over to the bank; giving a receipt for what they have taken out, which shows they had purchased the particular securities for which Niederberger to protect himself had a right to get a re-

ceipt. There is no question in my mind at all. Niederberger came to about the 18th or 19th of April and that was after the bank examiners got there—and got busy."

The receiver asserts that Niederberger was and is an experienced banker, and he "knew that the possession of these securities by *any* bank would be, and was, in direct violation of that condition which he describes by the phrase 'verbal pledge.' Yet, neither in the late afternoon of April 2, 1963, nor in the ensuing two days, while Willard was transferring securities to the Bank, did Niederberger do anything to put a stop to the transfers to the Westmont Bank. Niederberger's explanation is that he thought that the papers being transferred were 'credit files.' The uncontradicted evidence is that there were deposited in the Crest files, papers signed by Willard, on behalf of the Bank, which were receipts for securities taken."

The receiver argues that where a prejudicial situation has resulted from a wrongful act of a third person, the decision must be against that party whose conduct made possible the wrongdoer's act, breach of trust, fraud, or negligence (Equity, 19 Am Jur § 483, p 335), and that "when one of two innocent parties must suffer loss by reason of the wrongful acts of a third party, the rule is almost universal that the party who has made it possible, by reason of his negligence, for the third party to commit the wrong must stand the loss." Bartlett v. First Nat. Bank of Chicago, 247 Ill 490, 498, 93 NE 337.

The receiver also contends that a corporation is not charged with the knowledge of its officers and agents where the latter are engaged in committing independent fraudulent acts adverse to the corporation upon their account, and in support cites Fletcher's Cyclopedia, Corporations (1965), Vol 3, § 826, p 141, where it is said:

"One well-established exception to the rule that a corporation is charged with knowledge of its officers and agents, is where the latter are engaged in committing an independent fraudulent act upon their own account and the facts to be imputed relate to such fraudulent act."

■ Our view of the instant cause does not require that we determine the innocent party status of either Niederberger or the bank. The pre-agreement status quo should be restored insofar as it is practical. Niederberger has possession of $600,000 bank funds fraudulently disbursed to him. The receiver or bank had possession of $900,000 in commercial paper wrongfully assigned and delivered to it. Of the amounts due on the paper in the possession of Westmont, Niederberger collected and paid out $605,000. The balance of the paper has been, by the bank or the receiver, reduced to cash by collection or is still in the possession of the receiver. In either event, the paper or its proceeds should be returned to Crest, and Niederberger should return to the receiver the $600,000 bank funds wrongfully disbursed to him.

■ If it is not possible to return to Crest the balance of the paper or its proceeds, the amount due to be returned by Niederberger should be reduced in proportion. Also, as the record indicates that the instant fraudulent scheme was activated by conspirators not parties to the instant cause, the costs of the litigation should be borne equally by the plaintiff, Crest Finance Company, and the defendant bank, and we so direct.

For the reasons given, the decree appealed from is reversed and the matter is remanded for further proceedings in accordance with the views expressed herein.

Reversed and remanded.

KLUCZYNSKI, P. J. and BURMAN, J., concur.