(No. 39868.—

CREST FINANCE CO., INC., *vs.* FIRST STATE BANK OF WESTMONT.—(FEDERAL DEPOSIT INSURANCE CORP., Appellee, *vs.* LEO NIEDERBERGER, Appellant.)

*Opinion filed March 29, 1967.—Rehearing denied May 16, 1967.*

KLUCZYNSKI, J., took no part.
SCHAEFER and WARD, JJ., dissenting.

KIRKLAND, ELLIS, HODSON, CHAFFETZ & MASTERS, and RAPPAPORT, CLORFENE & RAPPAPORT, both of Chicago, (DON H. REUBEN, LAWRENCE GUNNELS, JOHN E. ANGLE, and HAMILTON CLORFENE, of counsel,) for appellant.

TAYLOR, MILLER, MAGNER, SPROWL & HUTCHINGS, of Chicago, and WILLIAM M. MORONEY and LESLIE H. FISHER, of Washington, D.C., (JAMES J. MAGNER and E. MARVIN BUEHLER, of counsel,) for appellee.

LYON & WARMAN, of Skokie, and LOUNDY & SIMON, of Chicago, (RICHARD LOUNDY and ERNEST D. SIMON, of counsel,) for amici curiae.

Mr. JUSTICE HOUSE delivered the opinion of the court:

Plaintiff, Crest Finance Company, Inc., filed a declaratory judgment action against the original defendant, First State Bank of Westmont, seeking a declaration that it was entitled to possession of certain commercial paper, asking that the bank be enjoined from disposing of or encumbering the paper and praying its return. About two weeks thereafter Joseph E. Knight, Director of the Department of Financial Institutions, took possession of the bank and appointed the Federal Deposit Insurance Corporation receiver. Upon petition, the receiver was granted leave to intervene and to make Leo Niederberger a third-party defendant. The circuit court of Cook County entered a decree finding the paper to be Westmont's property, ordered recovery by the receiver of $605,882.46 from plaintiff and Niederberger, representing collections on the paper to Oc-

tober 23, 1963, and enjoining plaintiff from making further collections.

The Appellate Court, First District, held that insofar as possible, the pre-agreement status of the parties be restored, that Niederberger refund the sale price of Crest's stock in the sum of $600,000 to Westmont, and that the paper belonged to Crest. (66 Ill. App. 2d 364.) We granted Niederberger's petition for leave to appeal.

This controversy arose out of an agreement by Niederberger to sell to Lester A. Brock all of the 750 outstanding shares of Crest, evidenced by certificates issued in the name of Niederberger and his wife jointly. Crest is an Illinois corporation engaged in the business of installment loans to relatively small business enterprises. Its loans were secured by notes, assignments of accounts receivable and liens on other collateral. Crest's receivables on February 28, 1963, approximately a month prior to the agreement, were $1,334,279.51, after deducting for deferred income and allowance for losses.

Brock was introduced to Niederberger by a broker and offered to buy Crest's stock for $600,000. In the negotiations leading up to an agreement Brock stated that he was acting not for himself but for a principal, the identity of whom he did not then disclose. He later testified that his principal was Lawrence A. Stickell.

Brock was closely associated with Stickell and Norman H. Weaver. They had gained control of First State Bank of Westmont in February, 1963. The bank's deposits were approximately $6,000,000 and its capital and surplus were about $350,000. These men proceeded to loot the bank in the manner hereinafter explained. (All three of them have been convicted in Federal court, and Stickell, a member of the bar, has had his name removed from the roll of attorneys.)

A meeting held at the office of Crest on April 2, 1963, was attended by Niederberger and his attorney, Brock, Otto

Stephani (the latter a broker who brought Brock and Niederberger together and to whom Niederberger paid a fee of $30,000), Wayne E. Willard, executive vice-president and cashier of Westmont, and two other persons, Urban, an employee of Westmont, and Ash, an employee of Crest.

The agreement was in the form of a letter offer by Brock to Niederberger dated March 30, 1963, and accepted by the latter at the meeting on April 2, 1963. The letter agreement provided that Brock was to pay $600,000 for the stock, that Niederberger's guarantees of some of Crest's indebtedness were to be eliminated by substitution of Brock's guarantee or payment, and Niederberger was to co-operate with Brock in the operation of Crest for three months at $1,000 per month, with Brock retaining an option for an additional three months at compensation to be agreed upon.

Willard attended the meeting under instructions from Stickell and Weaver. He was told he was to pick up paper (notes and other evidence of debt) for Westmont. He took four cashier's checks of Westmont to the meeting, one of which was signed by an assistant cashier. The others were unsigned and all were in blank as to payee and amount. At the meeting, three of the cashier's checks were completed. The one signed by the assistant cashier was drawn on Continental Illinois National Bank and Trust Company of Chicago and was made payable to Niederberger for $300,000. Two others drawn on the Mercantile National Bank of Chicago, for $150,000 each, were signed by Willard and made payable to Niederberger. The checks were delivered to Niederberger during the meeting.

At the time the cashier's checks were delivered, Crest bank loans which had been guaranteed by Niederberger, totaled approximately $900,000. Apparently Niederberger was unwilling to deliver the stock certificates representing his shares in Crest until relieved of his guarantees of its loans. Whereupon the parties agreed that the certificates would be placed in escrow with Niederberger's counsel. The

latter executed a brief escrow statement acknowledging receipt of the certificates, agreeing to hold the stock as escrowee pending written advice from his client (which of course, could not be withheld arbitrarily) that he had been released from all personal liability as guarantor of Crest, and agreeing to deliver the stock to Brock upon receipt of notice from Niederberger that his guarantees had been released.

After delivery of the checks, Brock and Willard were given access to Crest's files. During the late afternoon of April 2 and throughout the days of April 3 and April 4 Willard photostated installment notes and other paper held by Crest evidencing loans made by it (as well as the collateral relating to such loans), endorsed a receipt on each photostat and placed them in Crest's files. At the close of each day he removed the original material to Westmont's files. He gave a receipt to Helen Ware, a Crest employee, for the paper removed each day and then sealed Crest's vault where the remaining securities were kept for the night. The notes removed by Willard were payable to Crest and were unendorsed. Willard apparently was uninstructed as to the face amount of paper to be removed. He made no tabulation as he removed the paper, but he estimated that at the close of the day on April 4, he had removed about $900,000 in face amount. Willard's banking experience was limited. He was dominated in his activities for Westmont by Stickell, Weaver and Brock and the record does not indicate he was a party to the fraudulent conduct of the three. He read none of the documents presented at the April 2 meeting and none were read to him. He was unaware that the cashier's checks of Westmont were delivered to pay Brock's purchase price for stock of Crest rather than for purchase of Crest installment paper by Westmont.

After Willard completed removing Crest paper, he charged, by a "debit ticket" dated April 3, 1963, Westmont's accounts receivable ledger with $600,000 to offset

the $600,000 in cashier's checks payable to Niederberger, thus indicating on Westmont's records a purchase by it of accounts receivable for $600,000. Aparently Brock, Weaver, and Stickell believed Westmont had or would have $957,-000 in Crest installment notes as the result of Willard's transfers. (The Director of Financial Institutions checked this paper and located $868,158 in face amount, later found by the receiver to total $900,976 in face amount.) To account for the $357,000 excess, Willard prepared another "debit ticket" charging accounts receivable of Westmont with this additional amount. As an offset $357,000 was credited to a checking account which Brock, purporting to act for Crest, had opened with Westmont.

On the evening of April 4, although the escrow condition was unperformed and although the certificates were still held by the escrowee unendorsed, Brock proceeded to hold a stockholders meeting of Crest, at which he elected himself, Jack E. Sohn and Landra K. Ryan as directors. These directors then held a meeting. They elected Brock president and Sohn vice-president. To support Crest's purported sale of installment paper to Westmont they authorized Crest's sale of accounts receivable to Westmont in an amount not exceeding $1,000,000. They authorized Crest to "loan" practically the whole of the $357,000 bank balance to Stickell and Weaver and companies owned by them.

To complete the picture, the directors of Westmont met on April 4, authorized the purchase by Westmont of $957,000 of notes from Crest. In the minutes of this meeting the amount to be purchased was initially left blank, $957,000 later being inserted at the direction of Weaver and Stickell. Following these authorizations Brock, acting for Crest, purported to assign the installment notes and other paper to Westmont; funds of the bank were disbursed for the "loans" to Stickell and Weaver and their companies, and the amounts disbursed for these loans were charged to the Westmont checking account of Crest. At this point nearly

$957,000 in funds of Westmont had been diverted to the personal uses of Brock, Stickell and Weaver.

Examiners for the Director of Financial Institutions began an examination of Westmont in April of 1963. On April 18 the Director found that the managers of Westmont were violating the Banking Act, and on May 16, he took possession of Westmont. On May 24 the Director appointed the Federal Deposit Insurance Corporation as Westmont's receiver.

Niederberger stands on the proposition that the sale was consummated since the placing of the stock in escrow was an irrevocable commitment, that he was the holder in due course of cashier's checks totaling $600,000, and that the appellate court erroneously directed him to pay the proceeds of the checks to the receiver. The receiver counters with the assertion that Niederberger does not qualify as a holder in due course because he did not give "value" within the meaning of the Uniform Commercial Code, in that the sale of Crest stock was not consummated and the certificates evidencing ownership had not been transferred to Brock.

The effect of article 3 of the Code, (Ill. Rev. Stat. 1965, chap. 26, pars. 3—104 *et seq.*) must be considered. Section 3—302(1) reads: "A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." Section 3—302(2) states: "A payee may be a holder in due course." Section 3—303 provides: "A holder takes the instrument for value (a) to the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or (b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; or (c) when he gives a negotiable instrument for it or makes an irrevocable commitment to a third person."

The cashier's checks delivered to Niederberger, one signed by an assistant cashier and the other two signed by Willard, the cashier of Westmont, were negotiable instruments. If Niederberger became a holder in due course, the drawer bank (Westmont) could not recover from the paying banks nor from Niederberger. There is no evidence to substantiate lack of good faith on Niederberger's part or that he had any notice of any infirmities in the drawing or delivery of the checks at the time of delivery, so that provisions (b) and (c) of section 3—302(1) were complied with. (Subsequent knowledge does not impair holder-in-due-course status; sec. 3—304(6); see comment 12, sec. 3—304 of the Code; cf. *Drumm Construction Co.* v. *Forbes,* 305 Ill. 303.) This leaves only the question of whether Niederberger gave "value" for the three checks to determine his holder-in-due-course status.

The receiver asserts that placing the stock in escrow was an executory contract and that the agreed consideration (delivery of the stock) had not been performed in accordance with section 3—303(a) of the Code so that Niederberger had not parted with "value" for the checks. This ignores the "irrevocable commitment" language in section 3—303(c) which, according to comment 6 is new but recognizes an exception to the rule that an executory promise is not value. "Irrevocable commitment" in section 3—303(c) cannot be read to mean complete performance, otherwise it would be surplusage because the situation would have been covered by section 3—303(a). Here, Niederberger made an actual, physical delivery of the certificates evidencing ownership of the stock to the escrow agent without anything further to be done on his part except notify the escrowee when he had been relieved of his bank guarantees. Thus the transfer was irrevocable. The only remaining act to complete delivery was solely within the power of the buyer; that is, to either substitute his name on the guaranteed paper or pay the obligations. The failure

to endorse was unimportant since assignment was legally enforcible under the terms of the agreement. In our opinion, delivery to the escrow agent and the agreement to execute all documents necessary to consummate the sale constituted an "irrevocable commitment" within the meaning of section 3—303(c), comparable to an unrestricted letter of credit used as an illustration in comment 6 heretofore referred to.

The fact that Brock (or his principal) was a beneficiary of the escrow agreement does not, in our view, affect the irrevocable character of the escrow commitment made by Niederberger, nor render it a commitment of a type not covered by section 3—303(c). For example, had the Crest stock increased in value, the receiver, upon fulfilment of the escrow condition, might by appropriate proceedings, obtain Brock's interest in the Crest shares, demand delivery of the certificate by the escrowee, and demand completion of the transfer by the escrowee. Niederberger and the escrowee would have had no defense to this demand.

Since Niederberger had parted with "value," he met all the statutory standards to be a holder in due course of the cashier's checks and was entitled to retain their $600,000 proceeds.

The trial court decided this case on the equitable doctrine that where one of two innocent persons must suffer by the fraud of a third person, the loss must fall upon him who by his conduct put it in the power of such third person to cause the injury. The appellate court discussed the theory, but did not accept it, and stated that its view did not require a determination of the innocent party status of either Niederberger or Westmont. The receiver now renews this view as its primary contention on this appeal.

We do not believe the doctrine is applicable under the circumstances of this case. Niederberger testified that he had consented only to removal of credit files, not notes and collateral. It is clear, however, that Helen Ware, secretary of Crest working under the supervision of Niederberger,

knew that notes and other paper of Crest were being removed. No officer or agent of Crest knew that the paper was being removed under claim of ownership by Brock or Westmont. Brock himself testified that he indicated the documents were being removed from the files of Crest to facilitate examination and audit. When Helen Ware requested the return of certain securities taken which were paid in the interim, they were immediately returned, thereby negating any apparent claim of ownership by Brock or Westmont. The notes taken by Willard were payable to Crest and unendorsed. If Niederberger himself had affirmatively permitted removal of this unendorsed paper for the purpose of examination and audit, not aware that he was dealing with dishonest persons, it would not have been such negligence as to impose the loss on Crest. No one was misled to his harm by delivery of these unendorsed notes. The examiners of the Director of Finance were not, and there is no evidence that the F.D.I.C. took any action adverse to its or the bank's interests relying upon the unendorsed securities being in Westmont's vaults. Westmont's own officers and directors perpetuated the fraud on both Niederberger and the bank. The record does not show negligence on the part of Niederberger which permitted the fraud to be perpetuated.

Cases such as *Bartlett* v. *First National Bank of Chicago,* 247 Ill. 490, and *Decatur Lumber and Manufacturing Co.* v. *Crail,* 350 Ill. 319, are cases in which the equitable maxim was applied but to factual situations quite different from that in the case before us. We find difficulty in believing that all this fraud would have been prevented if Stickell and Weaver had not gained possession of the securities and placed them in Westmont's vault. Men of the morality of Brock, Stickell and Weaver were quite capable of fictitious bookkeeping to accomplish their fraudulent objectives even though Crest had prevented them from removing the paper.

In delineating the issues passed upon by this opinion, as

differentiated from possible issues which we do not reach, it may be helpful to review the actions taken by the trial court and appellate court.

The decree ordered that the securities obtained from Crest in the approximate amount of $900,000 belonged to Westmont and that the receiver was entitled to possession; that the receiver is entitled to $605,882.42 of Crest's assets collected by Niederberger from the date of the letter agreement to October 23, 1963; that collections made by the receiver and segregated in a special bank account be paid by the depository bank to receiver; that the costs be assessed to Crest and Niederberger; and reserved for future consideration "the withdrawal of any security given on the granting of the writ of temporary injunction," and the question of damages, if any, for the wrongful suing out of the writ. The trial court refused to follow the master's recommendation that the ownership of the Crest stock was vested in the receiver and left that question open.

The appellate court held that the pre-agreement *status quo* should be restored insofar as practicable. This was to be accomplished by the return to Crest of the $900,000 in paper or its proceeds ($605,000 of which it was said was collected and paid out by Niederberger) by the receiver; Niederberger to pay to receiver the $600,000 which he received for Crest's stock, provided that if it is not possible to return to Crest the balance of the paper or its proceeds the $600,000 returnable by Niederberger to be reduced in proportion; and the costs to be divided between Crest and Westmont. The opinion is otherwise silent as to the final ownership of Crest.

We agree with the appellate court that the approximate $900,000 in paper, or its proceeds, which was taken from Crest is properly returnable *in toto* to Crest by the receiver. This for the reason that Brock could not legally pass title through his "dummy" board of directors. His position was analogous to that of a pledgee of shares who is not entitled

to vote the shares until they have been transferred. (*Cf.* sec. 30 of the Business Corporation Act, Ill. Rev. Stat. 1961, chap. 32, par. 157.30.) His transfer of the paper was invalid. To this extent only the Appellate Court, First District, is affirmed. Its holding is reversed as to the direction to Niederberger to pay $600,000 to the receiver. By delivery of his stock under the letter agreement, Niederberger was entitled to the cashier's checks totaling $600,000, and to be relieved of his guarantees of loans. He is entitled to nothing more.

We now come to the areas which cannot be decided on this appeal. The appellate court refers to amounts collected by Niederberger on the paper in possession of Westmont and paid out in the amounts due on such paper as $605,000 (actually $605,882.46). According to a report filed in Crest's behalf by Niederberger there was other commercial paper owned by Crest against which there were obligations. In response to a motion, Crest filed an accounting-answer which disclosed that the balance due Crest on the transferred paper as of April 2, 1963, was $848,165.25; that by October 23, 1963, Crest had collected $605,882.46 on such paper, and that $43,051.20 in deferred income was allowed, leaving a balance due on those particular assets of $202,565.05. The accounting further showed that the total due banks from Crest on April 2 was $1,010,000, that Crest had paid a total on amounts due banks of $955,000 leaving a net balance due banks of $55,000. In addition, Crest paid $260,000 to note holders and $62,000 to Salem Acceptance Co. or a total paid out by it of $1,277,000.

The weird situation of collection being made by Crest through the former owner of the stock in the face of an injunction probably resulted from the fact that Brock's scheme was soon discovered and he was prevented from operating the business, even if he intended to. Debtors continued to make their payments at the Crest office and someone had to receive them. Niederberger accepted them in

Crest's behalf, whether through the employment feature of the letter agreement or because he was anxious to be relieved of his guarantees is not shown by the record. There seemed to be confusion as to whether the paper belonged to Westmont (in the hands of its receiver) or Crest, and no receiver was appointed for Crest.

The issues of who is the present owner of the Crest stock and whether Westmont has an equitable lien on that stock cannot be reached on this appeal since Brock and his purported principal are not parties. For that reason, together with the peculiar posture of this case, we are in no position to pass upon the role of Pearson Securities Corporation, the deferred income debit of $43,051.20 charged against Crest's assets and the management activities of Niederberger, including his $2500 per month salary charged to Crest. None of these items were specifically passed upon by the trial court.

Pearson was a corporation organized May 16, 1963, wholly owned by Niederberger, which purchased a substantial portion of Crest's assets for $750,000. The trial court will determine whether the transaction with Pearson was fair in view of the dual interests of Niederberger, the effect, if any, of the breach of the covenant in the letter agreement by Niederberger not to engage in a similar business for three years, and whether the $2500 per month salary was justified. ($1000 per month was fixed in the letter agreement.) The court may want to scrutinize the deferred income item (probably discounts) of $43,051.20, particularly that part allowed to Pearson on the paper purchased by it.

The judgment of the Appellate Court, First District, is affirmed in part and reversed in part, and the cause is remanded to the circuit court of Cook County for further proceedings, not inconsistent with this opinion.

*Affirmed in part and reversed in part and remanded, with directions.*

Mr. JUSTICE KLUCZYNSKI took no part in the consideration or decision of this case.

Mr. JUSTICE SCHAEFER, dissenting:

The opinion holds that Niederberger is entitled to retain the $600,000 of Bank funds which he received because he was a holder in due course of the Bank's checks in that amount. As the opinion notes, a holder in due course must, in addition to other requirements, have given "value" for the instrument. (Ill. Rev. Stat. 1963, chap. 26, par. 3—302.) The majority holds that Niederberger gave value when he placed the Crest stock in escrow with directions not to release it to Brock until Brock relieved him of his obligations as a guarantor. By placing the stock in escrow, in the view of the majority, Niederberger made an "irrevocable commitment to a third person" which constitutes giving of value as defined in section 3—303(c). That section states: "A holder takes the instrument for value * * * (c) when he gives a negotiable instrument for it or makes an irrevocable commitment to a third person."

I am unable to agree that an "irrevocable commitment" was made, or that the purchaser of the stock was a "third person", within the meaning of section 3—303(c).

The comments to section 3—303 state that "an executory promise to give value is not itself value, except as provided in paragraph (c)." To fall within paragraph (c) and thus constitute value, an executory promise must be irrevocable. The comment explains that the Code refuses to treat other promises as value because a person who has taken a defective instrument but has given only a promise in return does not need the protection against claims and defenses afforded the holder in due course. He can protect himself from loss by refusing to carry out his part of the bargain and treating it as rescinded. The comment states: "The underlying reason of policy is that when the purchaser learns of a defense against the instrument or of a defect in

the title he is not required to enforce the instrument, but is free to rescind the transaction for breach of the transferor's warranty (Section 3—417)." The person who has made an irrevocable commitment, however, cannot rescind.

The Code adopts a principle applied in equity, stated by Judge Story, in *Wormley* v. *Wormley,* 8 Wheat. 421, 449, (5 L. Ed. 651), "It is a settled rule in equity that a purchaser without notice, to be entitled to protection, must not only be so at the time of the contract or conveyance, but at the time of the payment of the purchase money."

The principle is recognized in cases holding that when a bank has received a negotiable instrument and credited it to the transferor's bank account, the bank has not given value and is not a holder in due course. Instead, it has merely made an executory promise to the depositor to pay him a sum on demand. See *First State Bank and Trust Co.* v. *First Nat. Bank of Canton,* 314 Ill. 269, 273 (1924); Brannan, Negotiable Instrument Law 520 (Beutel ed., 1948).

As applied to the present case this principle indicates that Niederberger was not a holder in due course. At no time had he given value as defined in section 3—303(c). His undertaking was contingent upon the elimination of his personal liability as a guarantor. When Niederberger learned that the checks had been fraudulently obtained, he was in a position to rescind his agreement with Brock, as the comment to section 3—303 suggests, on the ground that when Brock negotiated the checks he had breached his transferor's warranty that "(a) he has a good title to the instrument * * * and the transfer is otherwise rightful; and * * * (d) no defense of any party is good against him; * * *." (Ill. Rev. Stat. 1963, chap. 26, par. 3—417(2)). These warranties had been breached since the instruments were obtained from the bank by fraud and without consideration.

Section 3—303 of the Commercial Code expresses a policy of withholding "holder in due course" status from

the transferee of a negotiable instrument when the transferee can effectively protect himself against infirmities in the instrument. Whether the transferee can protect himself depends, under section 3—303, upon whether his commitment is "irrevocable" and to a "third person." In the present case Niederberger's commitment was conditional, and the condition was not fulfilled. And in my opinion it is inappropriate to treat Brock a "third person" within the meaning of section 3-303. He was the transferor of the instrument involved.

Mr. JUSTICE WARD joins in this dissent.