Ellis Electrical Laboratory Sales Corporation, Appellant, v. Hugh J. Ellis and Ellis Electrical Laboratory, Inc., Appellees.

Gen. No. 36,370.

418

Opinion filed February 9, 1933. Rehearing denied February 25, 1933.

ALTHEIMER, MAYER, WOODS & SMITH, for appellant.

JAMES F. BURNS, for appellees.

MR. JUSTICE MATCHETT delivered the opinion of the court.

Complainant appeals from a decree which dissolved a preliminary injunction theretofore issued and dis-

missed its bill for want of equity. The bill prayed that an injunction issue restraining defendants from the violation of the provisions of a contract by which defendant, Hugh J. Ellis, granted complainant an exclusive sales agency for a microphone and other electrical products manufactured by him. The bill averred the execution of the contract and performance thereof on the part of complainant and the violation of the contract by defendants by an announcement to the trade that after January 1, 1932, they would sell such products direct to customers.

Defendants admitted the execution of the contract but denied other material averments of the bill, and in answer to a supplemental bill, wherein complainant asserted that defendants had surreptitiously obtained a list of complainant's customers, defendants replied that the lists were obtained in a proper way, and further, for the first time set up the defense that the contract itself was void and unenforceable for want of mutuality; that a decree for an injunction would amount to specific performance and that the contract, not being mutual, could not be so performed.

The cause was put at issue and referred to a master who reported that the contract was void and unenforceable. Objections of complainant were overruled, and these by order stood as exceptions upon the hearing before the chancellor, who also overruled the same and entered the decree in conformity with the recommendation of the master.

The facts concerning the circumstances under which this controversy arose between the parties would seem to be as follows: Defendant Hugh J. Ellis is 67 years of age and has been in the electrical business since 1880. In 1924 he began to do business under the name of "Ellis Electrical Laboratory." His factory was at his home in Berwyn, Cook county, Illinois, where he manufactured radio accessories. He made some sales

of his products to the firm of Shure Brothers Company, which was composed of S. N. Shure and S. J. Shure, whose business was located in Chicago.

Ellis was experimenting with the manufacture of a microphone called the ''Ellis Microphone,'' of which he was the inventor and for which he obtained patents. Ellis exhibited one of these microphones to Shure Brothers. The microphone was also in use at a radio station in Cicero, Illinois, and one of the Shures examined it there. Up to June, 1929, Ellis had sold only nine of these microphones. As a result of their examination the Shures became interested. They gave an order for 12 of these microphones to Ellis, who delivered the same for the total price of $216, or $18 each. This order was delivered about July 6, 1929. The Shures further indicated their interest at that time by making an advancement to Ellis of $84 in cash, which Ellis apparently needed for the development of his invention.

Although the master did not so find, the evidence would have warranted the finding that before the execution of the written contract on which the suit is based, a verbal agreement existed between the Shures and Hugh J. Ellis that Ellis would not sell the microphones to any other person. The evidence also would warrant a finding that even at the time of the execution of the contract the microphone had not been completely developed and that Shure Brothers gave some assistance toward the perfection of it.

The contract in question was executed October 24, 1929. It is in writing and under seal. It states that it is made between Hugh J. Ellis, trading as the Ellis Electrical Laboratory, Berwyn, Illinois, as party of the first part, and S. N. Shure and S. J. Shure of Chicago, as parties of the second part. It is in seven paragraphs. In the first paragraph the Shures agree to do business under the name of ''Ellis Electrical

Laboratory General Sales Office" at any place they may desire for the purpose of handling microphones, radio coils and other articles which Ellis may manufacture.

In the second paragraph the contract provides that the Shures as the second parties shall be the sole sales officials or distributing officers for the products manufactured by Ellis, "and said first party agrees that they will not sell, directly or indirectly, any of such products to any other person, firm or corporation during the term of this contract."

By the third paragraph Ellis agrees to sell and deliver microphones of the then style and as then manufactured at the price of $18 each, deliveries to be made with diligent promptness after orders are placed.

It is agreed by the fourth paragraph that in case of any change in the market conditions or in case of competition affecting the profits to be earned by the Shures, the prices are to be reduced accordingly, "agreeable to both parties."

By the fifth paragraph the Shures agreed to purchase and Ellis to deliver at their request a minimum of 100 microphones a year. The Shures further agreed that they would exert "all efforts for effective distribution," and further that if they did not purchase at least 100 microphones during the course of the year, Ellis should have the option to cancel the contract without further obligation on the part of either party.

The sixth paragraph provided that the Shures would agree to purchase radio coils and other items at prices to be agreed upon and that they would act as sole sales officers and distributors for items.

The seventh paragraph provided that the agreement should be for a period of five years from the date of it.

After the execution of the contract of October 24, 1929, the Shures gave various orders for the products

of Ellis (which were filled) and paid for the same. They effected a sales organization, secured the cooperation of dealers in various parts of the United States, advertised the Ellis microphone in circulars, catalogs, and trade journals and in other ways. The master found that this advertising cost the sum of approximately $6,600. Up to the time of the filing of the bill of complainant Ellis had received from the Shures under the contract approximately $32,000 for microphones purchased thereunder.

Subsequent to its execution the contract in question was with the written consent of Hugh J. Ellis assigned by the Shures to the complainant corporation, Ellis Electrical Laboratory Sales Corporation. Some time thereafter in July, 1931, defendant Ellis, without the knowledge or consent of complainant or its predecessors in interest, caused the defendant Ellis Electrical Laboratory, Inc. to be incorporated under the laws of Illinois, and turned over his business of manufacturing at Berwyn to said corporation.

In November or December, 1931, defendant Ellis Electrical Laboratory, Inc., caused a large number of postal cards to be sent to prospective purchasers of microphones notifying them that beginning January 1, 1932, the Ellis microphone and other electrical equipment covered by the contract could be purchased direct from the Berwyn factory of said corporation, and shortly thereafter the defendant company made a sale or sales of microphones to the International Sound Recording Company.

Defendant Ellis is a stockholder, officer and director of the defendant corporation, and with other members of his family is actively engaged in carrying on in the name of this corporation the business in which he was engaged at the time the contract in question was executed.

Complainant sales corporation was incorporated by agreement of the parties to the contract on June 17, 1930. The defendant corporation, without any such agreement, was incorporated on July 2, 1931. Defendants contend that the Shure Brothers Company, which was originally a partnership and later incorporated, was the predecessor in interest of complainant, and that it sold microphones in competition with those made by defendant. The record does not justify this statement. A stipulation of the parties is to the effect that Shure Brothers Company sent out these microphones, and there is a statement in the record by defendants' solicitor to the effect that this was a separate concern from the complainant corporation. Moreover, the microphone offered for sale by the Shure Brothers Company was a condenser microphone, while that made by defendants was a carbon. .The condenser microphone was offered for sale at the sum of $250. The carbon microphone made by defendants was put on the market at from $15 to $85 each. As complainant points out, there is no proof in the record that in the sale of these two kinds of microphones there was in fact competition.

There is evidence in the record to the effect that the Shures unsuccessfully tried to get defendant Ellis to enter into other agreements whereby the written contract upon which this suit is based would be abrogated and a corporation organized to obtain the ownership of the invention which the Shures wished to control through owning 51 per cent of the stock of the corporation to be formed. The evidence was admitted but is not, we think, material upon any issue.

It also appears that on December 10, 1931, complainant sent out a circular letter to the effect that it would thereafter conduct its business as the Ellis Electrical Laboratory Sales Corporation, Division of Shure Brothers Company, and that since its organization

this company has been a subsidiary of that corporation. It is urged that complainant used forms of advertising in which an attempt was made to minimize the words "Sales Corporation" as the same by agreement appeared in the name under which complainant was to sell the products of defendants. In some forms of advertising the initials "S. C." were substituted for the full words. In others the words, "Sales Corporation" appeared in small type, and the name of S. N. Shure, president, was prominently displayed. Defendants complain that in all this advertising matter the Chicago address of complainant was given rather than the Berwyn office of defendants. Defendants argue that all these things indicate an intention on the part of complainant to appropriate the business of defendant Ellis without his consent. It appears, however, from the evidence that the address "Chicago" instead of "Berwyn" was cast into the microphone by defendants, and that Ellis and his daughter who assisted him knew of these forms of advertising from the very first and in fact assisted in sending out the advertising. Defendants are not, under these circumstances, in a position to complain.

In urging their point against the enforcement of this contract defendants say that the things we have above enumerated could have been done for no other purpose than to represent to the public and customers that complainant was the Ellis Electrical Laboratory and not the Ellis Electrical Laboratory Sales Corporation; that upon the expiration of the contract defendant company would find itself unknown to the trade and complainant practically in possession of the customers of defendant company. These things, they say, amounted in fact to misrepresentations affecting not only their private rights but the public as well. They cite *American University v. Wood*, 294 Ill. 186,

We are not impressed by these contentions. Defendants as owners of the patents and manufacturers of the product, at the expiration of the term of the contract, would be in a position to appropriate the trade and good-will built up through complainant's money and organization. If the contract was unconscionable, it seems to us it was so with respect to complainant rather than defendants. There is not a provision in the entire contract which in any way protects at the expiration of the same the trade and custom which the money and labor of complainant may have acquired. It is not difficult to understand why complainant desired another agreement which would protect it in these respects. We cannot hold that as to defendant Ellis the contract is unfair or inequitable. The master did not find (as defendants now contend) that complainant was in court with unclean hands in this matter. Defendants filed neither objection nor exception to the report, and if filed, such exceptions could not have been sustained.

The controlling question therefore in the case is whether the contract is void or unenforceable because of lack of mutuality either in the obligations of the contract or in the remedy. As to the mutuality, so far as obligation is concerned, we do not entertain a doubt. A consideration of the whole contract (which is, we think, the method by which it must be interpreted) shows that promise was given for promise, and that it was at its inception a valid bilateral agreement. The inventor agreed not to sell directly or indirectly to any other. The sales agents agreed to conduct a sales office under the name as provided in the contract. The inventor agreed to sell and deliver to the sales agents microphones of a certain style for a specified price, and agreed to deliver with promptness after orders were placed. The sales agents agreed to purchase a minimum number of these microphones each

year at a stated price, and the inventor agreed to deliver at that price. There was a further provision that if during any one year the sales agents failed to keep this promise, the contract at the option of the inventor and manufacturer might be canceled. The term for which the agreement should last was also certain and fixed. There were other provisions which, considered alone, were not mutually binding and enforceable, but these agreements seem to have been made certain, specific and mutual by oral agreements of the parties thereafter made with respect thereto.

The question of the mutuality of remedy raises a more difficult question, but the tendency of the later authorities is to the effect that the fact that the remedy of specific performance is not available to one party is not a sufficient reason for refusing it to the other party, and that the fact that the remedy of specific performance is available to one party to a contract is not in itself a sufficient reason for making the remedy available to the other. It may be of weight, however, when accompanied by other reasons, and it may be decisive when the adequacy of damages is difficult to determine and there is no other reason for refusing specific enforcement. Restatement of the Law of Contracts, sec. 372. Defendants contend that the rule is otherwise in Illinois, and we think it must be conceded that the decisions are not easy to harmonize. Defendants say that a bill for an injunction restraining a breach of negative covenants is in effect a bill for specific performance and governed by the same rules; that if a contract lacks mutuality either as to obligation or as to the remedy available, neither specific performance nor an injunction to restrain the breach of the negative covenant in it may be sustained. *Welty v. Jacobs,* 171 Ill. 624; *Ulrey v. Keith,* 237 Ill. 284; *Bartholomae & Roesing Brewing & Malting Co. v. Modzelewski,* 269 Ill. 539, and other cases are relied on.

The leading case as to the circumstances under which equity will enjoin the breach of a negative covenant for personal services is *Lumley v. Wagner,* 1 De G. M. & G. 604, where, no other remedy being available, the injunction was allowed.

In *Welty v. Jacobs, supra,* Jacobs sought an injunction against Welty and the third party, Newell, who in violation of the covenants of Jacobs, was about to give a performance known as the "Black Crook" at the Alhambra Theater in Chicago. The injunction was granted and Jacobs held guilty of contempt for violation of it. The Supreme Court upon appeal held "without determining whether there may not be exceptional cases not falling within the general rule," that the bill was in substance for specific performance, and that the jurisdiction of equity was substantially coincident with its jurisdiction to compel such specific performance. The facts averred showed that it was impossible to compel such performance, and the judgment of the Appellate Court reversing the judgment of the trial court was affirmed.

In *Ulrey v. Keith, supra,* an injunction order based on a lease of oil land was reversed, it appearing that complainant lessee had under the lease the right to surrender the same at his option at any time.

The case most relied on is *Bartholomae & Roesing Brewing & Malting Co. v. Modzelewski, supra.* In that case the Modzelewskis, owners of real estate, entered into a real estate contract with the brewing company whereby in consideration that the company would furnish fixtures for the operation of a saloon, they agreed that for a certain time named they would purchase from the brewery and from no one else whomsoever, all the draught beer used by them. Differences arose and the Modzelewskis began to purchase other beer, whereupon the brewing company filed a bill praying that they might be enjoined from making such purchases. A temporary injunction issued on the recom-

mendation of a master. Defendants answered and made a motion to dissolve which was denied, and they appealed to the Appellate Court where the decree was reversed for the reason, as stated, that complainant had an adequate and complete remedy at law. The cause was remanded with directions to dissolve the injunction. 183 Ill. App. 352. The cause was reinstated and an order of dissolution entered. Thereupon, defendants petitioned for damages, which upon hearing were allowed, and upon appeal to the Appellate Court the judgment was affirmed. The cause was then removed to the Supreme Court by a certificate of importance. It was urged there that the breach of the contract should have been enjoined independently of whether complainant had an adequate remedy at law. The court said that the obligation of complainant to manufacture beer was one which could not be enforced without the court supervising the business of a brewing company, and that this the court could not do; that the contract therefore lacked mutuality, and that defendants in case of breach would have been left to seek their remedy at law; that the injunction therefore would not lie "unless it appears that appellant will suffer an irreparable injury for which the law affords it no adequate remedy at law." The court further held that complainant had such remedy in the contract which provided for liquidated damages in case of breach.

That in default of an adequate remedy at law an injunction will be issued in such cases, there is a wealth of authority in this and in other jurisdictions. *Southern Fire Brick & Clay Co. v. Garden City Sand Co.*, 223 Ill. 616; *Singer Sewing Mach. Co. v. Union Button Hole & Embroidery Co.*, 1 Holmes 253. In *National Marking Mach. Co. v. Triumph Mfg. Co.*, 13 F. (2d) 6, Judge Sanborn states as settled beyond debate or the necessity of citation of authority: "A court of

equity may issue its injunction to prevent a violation, or the continuance of a violation, of a contract in cases in which it would not decree specific performance thereof.'' Many other cases to the same effect might be cited.

To sum up it is clear that defendants are about to deprive complainant of its rights under a valuable contract which is fair and just on which it has expended large sums of money, and that there is no adequate remedy at law in case of such breach. The court therefore erred in dissolving the injunction and dismissing the bill for want of equity. The decree is reversed and the cause remanded with directions to enter a decree making the temporary injunction issued permanent as prayed.

*Reversed and remanded with directions.*

McSurely, P. J., and O'Connor, J., concur.