**SOUTHWEST FOREST INDUSTRIES, INC., Plaintiff-Appellee,**

v.

**Robert SHARFSTEIN et al., Defendants-Appellants.**

**No. 18712.**

United States Court of Appeals, Seventh Circuit.

Feb. 23, 1972.

916

Joseph L. Baime, Stephen G. Baime, Baime & Baime, Chicago, Ill., for defendants-appellants Robert Sharfstein and Richard Sharfstein.

Barry A. Pitler, Masor, Pitler & Wagman, Chicago, Ill., for defendant-appellant Pride Container Corp.

Frank M. Covey, Jr., McDermott, Will & Emery, Chicago, Ill., for Southwest Forest Ind., Inc.; Byron L. Gregory, Chicago, Ill., of counsel.

Before KERNER *, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This diversity case [1] involves the interpretation of the language in a non-competition covenant of an employment contract ancillary to the sale of the capital stock of a corporation.

---

* Judge Kerner heard oral argument, but did not participate in the adoption of this opinion.

1. The plaintiff is a Nevada corporation with its principal place of business in Phoenix, Arizona. The individual defendants are citizens of Illinois; the defendant Pride Container Corporation is an Illinois corporation with its principal place of business in Chicago.

In June of 1961, Southwest Forest Industries, Inc. ("Southwest") was engaged in the manufacturing and selling of lumber and paper products, including paperboard and corrugated containers, on a national basis. Premier Container Corporation ("Premier") was engaged in the manufacturing and selling of paperboard and corrugated containers within a radius of about 150 miles of its Franklin Park plant in the Chicago metropolitan area.

Because Chicago is "the largest box market in the world," Southwest was then seeking to obtain an established container plant in that area. Premier had been operating since 1954; Robert Sharfstein, his son Richard Sharfstein, Joseph Sislow and Marshall Stein ("Premier shareholders") each owned 25 percent of the capital stock.

Representatives of Southwest visited the Premier plant in July and began negotiations to purchase the Premier stock. A stock purchase agreement was executed on September 28, 1961 between Southwest and the Premier shareholders.

Under the stock agreement, the Premier shareholders agreed to sell all their capital stock for $800,000, subject to adjustment for the net profit or loss of Premier for the period from July 1, 1961 to December 31, 1962. The "closing date" for the transaction was to be March 13, 1963. At any time after September 28, 1961, the Premier shareholders, or at any time after March 13, 1962, Southwest, could upon 90 days' written notice establish an earlier closing date and an earlier date for determining the adjustment to be made in the price of the stock.

The man who was president of Southwest in 1963 testified that "we had many problems in attempting to start our paper mill up, which drained us of cash; and we did not have the cash available to close." Instead of accelerating the closing date, Southwest sought to postpone it. Consequently a supplemental agreement was executed by the parties on February 13, 1963.

Under the stock agreement as supplemented, the purchase price for the capital stock of Premier was $816,000, subject to adjustment for the net profit or loss of Premier for the period from July 1, 1962 to January 31, 1963, the latter date being established as the "Determination Date." The "Closing Date" was established as April 3, 1963.

As an integral part of (and constituting a portion of the consideration by both Southwest and the Premier shareholders for) the stock agreement, each of the four shareholders was to be employed under a written contract for a period of five years at a basic salary of $400 per week plus an annual bonus of 5 percent of the net earnings of Premier up to $100,000 and 7½ percent of the net earnings in excess of $100,000. The term of employment was to be "a period of five (5) years commencing on the Determination Date as such date is defined" in the stock agreement. On February 13, 1963, the parties supplemented each of the four written employment contracts to agree "that the 'Determination Date' occurred on January 31, 1963, and that the term of employment of Employee with Premier under the Employment Agreement commenced on February 1, 1963."

Subsequent events occurred as scheduled in the stock and employment agreements as supplemented: Southwest began operating Premier as of January 31, 1963; the sale of the capital stock of Premier to Southwest was closed on April 3, 1963 for $924,150, divided equally among Robert and Richard Sharfstein, Joseph Sislow and Marshall Stein. The adjustment of the $816,000 basic price to the $924,150 final price was determined by an audit of Premier as of January 31, 1963.

For about four and a half years everything went smoothly; both the Southwest representatives and the Sharfsteins testified as to the pleasant and profitable relationship.

In May 1967, Southwest appointed a man named Dunavin as vice president in

charge of container operations and sent him to Chicago, where he asserted aimless and highly abrasive authority over the Premier operation. He was replaced in four months, but in that short time he succeeded in destroying a great part of the valuable employee relations which the Sharfsteins had developed since 1954 and which Southwest had purchased in the form of employee good will in 1963. There is no need to relate in detail the multitude of pointless and ridiculous events in which Dunavin figured.

The testimony adduced on both sides indicated very clearly that, absent the Dunavin episode, there would have been no reason why the fine relationship between Southwest and the Sharfsteins would not have continued indefinitely. Instead, the association retrogressed into an arms' length situation with the Sharfsteins, whose security had been seriously threatened, understandably wary about their future. As of January 31, 1968, Southwest had not notified them whether their employment contracts would be renewed.

The four employment contracts contained the following non-competition covenant:

"Employee covenants and agrees in connection with this Employment Agreement (and without regard to any termination thereof for any cause), and in connection with the contract for the sale of his Premier stock to Southwest, that for a period of five (5) years after conclusion of the sale of such stock to Southwest under and pursuant to the terms of the Stock Agreement (or, if upon the expiration of this Employment Agreement, Southwest is willing to extend the same upon terms not less favorable to Employee than those provided herein, and Employee shall be unwilling to do so, then for a period of five (5) years following the termination of this Employment Agreement) he will not, either directly or indirectly, own, manage, operate, control, be employed by, or be connected in any manner with any type of business in which Premier is now engaged, or in which it may be engaged upon expiration of such period at any point in Cook County, Illinois or within a radius of one hundred fifty miles of Premier's plant at Franklin Park, Illinois, or in any such business which is making sales and distributions in any county in Illinois and adjoining states in which Premier has had sales and distributions, which is Premier's agreed trade territory, and that he will not own any interest or stock in, or provide any financing for, any business which is so engaged within said radius, or in any such county."

The Sharfsteins construed the covenant as terminating their employment and also their duty not to compete on January 31, 1968. On February 3, 1968, they tendered their resignations; on February 16, the resignations became effective. They then formed Pride Container Corporation ("Pride"), which engaged in the production of corrugated and other paper products and had its principal place of business in Chicago.

Southwest brought suit against Pride and Robert and Richard Sharfstein to enjoin the defendants from competing with Southwest in violation of the terms of the restrictive covenant and to recover actual and punitive damages.

The case was tried on the issue of liability only before the court sitting without a jury. The district court found that the non-competition covenant was effective through April 3, 1968, and that the defendants "committed a legal wrong" in connection with hiring Southwest personnel during the period February 3 through June 7, 1968.

The district court stated his opinion under 28 U.S.C. § 1292(b) that his order involved a controlling question of law as to which there is a substantial ground for difference of opinion "on the construction of a written agreement, under all of the facts and circumstances, and concerning the non-competitive terms thereof, both as to length and area."

This court subsequently accepted the interlocutory appeal.

## I

The crucial issue in this appeal is the determination of the expiration date of the original five-year period of non-competition. The language appearing in each of Robert and Richard Sharfstein's employment contracts is that he will not compete "for a period of five (5) years after conclusion of the sale of such stock to Southwest." Southwest contends that since the "closing date" for the sale of the stock was April 3, 1963, the termination date of the original five-year period was April 3, 1968. The Sharfsteins contend that, because the "Determination Date" under the stock agreement and employment agreements was January 31, 1963, the expiration date of the non-competition covenant was January 31, 1968. Disposition of the other issues hinges upon the determination of the first termination date.

The district court found as follows in his judgment order:

"1. The non-competition agreement contained in Paragraph 10 of the employment agreement is effective for the five year period February 1, 1968 through January 31, 1973, and is reasonable and enforceable.

"2. The alternate non-competition agreement contained in Paragraph 10 of the employment agreement was effective for the period February 1, 1968 through April 3, 1968, and it was violated by the defendants."

The stock agreement provided that it "shall be construed in accordance with and governed by the laws of the State of Illinois;" the parties' intention should be honored. Lauritzen v. Larsen, 345 U.S. 571, 588–589, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Tele-Controls, Inc. v. Ford Industries, Inc., 388 F.2d 48, 51 (7th Cir. 1967). The employment contracts did not contain a similar choice-of-law clause but, as shown hereafter, the stock agreement and employment con-

tracts are inseparably related. In any event, the employment contracts were to be performed in Illinois and, under Illinois law, the place of performance would provide the governing law. Ryan v. Napier, 252 F.Supp. 730, 732 (N.D.Ill. 1966). We therefore determine this appeal in accordance with Illinois law.

The evidence indicates that the various agreements between the parties were fully negotiated and bilaterally drawn by the parties and their attorneys. Hence, there is no occasion to apply the rule construing contracts against the party who drew them or whose attorney drew them. Cf. Marshall Field & Co. v. J. B. Noelle Co., 81 Ill.App.2d 409, 414, 226 N.E.2d 454, 457 (1967); Hansen v. Johnston, 111 Ill.App.2d 88, 94, 249 N.E.2d 133, 136 (1969).

On the other hand, in Illinois restrictive covenants are strictly construed. All doubts must be resolved in favor of natural rights and against restriction. Cockerill v. Wilson, 265 N.E.2d 514, 517 (Ill.App.1971); Staley v. Mears, 13 Ill. App.2d 451, 456, 142 N.E.2d 835, 837 (1957); Crest Commercial, Inc. v. Union-Hall, Inc., 104 Ill.App.2d 110, 117, 243 N.E.2d 652, 656 (1968).

It is elementary, of course, that the keystone of contract interpretation is to ascertain the intention of the parties from the language they used. The meaning of the words which the parties employed is found by focusing on the words themselves and then drawing back and testing that meaning in the context of the entire contract or, as here, in the combined context of the stock agreement and employment contracts. This test must finally be read against the background of the circumstances and situation with which the parties were dealing.

The bare words "for a period of five (5) years after conclusion of the sale of such stock to Southwest" are ambiguous until the meaning of "conclusion of the sale" is determined.[2]

---

2. The parties agree that, if they had used the words "for a period of five years after the determination date," the period

would have terminated on January 31, 1968; if they had used the words "for a period of five years after the closing

Because the sale of stock refers to that sale described in the stock agreement and because the restrictive covenant in the employment contracts specifically refers to it ("Employee covenants and agrees in connection with this Employment Agreement . . . and in connection with the contract for the sale of his Premier stock to Southwest. . . . ."), the terms of the stock agreement executed on September 28, 1961, as supplemented by the agreement of February 13, 1963, are of vital importance.

The Premier shareholders on September 28, 1961, deposited all the capital stock certificates "properly endorsed in blank, with signatures guaranteed" in escrow with a Chicago bank. None of the certificates deposited with the escrow agency were to be returned or redelivered except as provided in the agreement (Par. 3). At the same time, the four employment contracts with the two Sharfsteins, Sislow and Stein were executed and deposited in the same escrow.

The supplemental agreement of February 13, 1963, added a new paragraph 6A which was entitled "Right of Stockholders To Cancel Agreement." This "right to cancel" was conditioned upon Southwest's selling all or substantially all its assets or effecting a merger in which Southwest was not the surviving corporation and after which the surviving corporation was not controlled by persons "who are presently stockholders of Southwest." In other words, the so-called right of stockholders to cancel was fully controlled by the actions of Southwest.

The stock agreement as supplemented also provided that in the event that Southwest failed to close the transaction it should pay $150,000 to the Premier shareholders as liquidated damages (Par. 7). On September 28, 1961, Southwest advanced $150,000 to Premier in exchange for Premier's promissory note

(Par. 10). In the event of Southwest's failure to close, payment of liquidated damages was to be made "by Southwest endorsing without recourse and delivering to Stockholders the promissory note of Premier in the principal amount of $150,000" (Par. 7).

The net effect of the provisions of the stock agreement as supplemented was that on September 28, 1961, Southwest made a down payment on the Premier stock of $150,000, the stock was deposited in escrow, and the determination of whether the sale would be consummated or the down payment forfeited was almost entirely within the control of Southwest.

In Bershad v. McDonough, 428 F.2d 693 (7th Cir. 1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971), this court held that, for purposes of applying the rule for recovery of "short-swing" profits under Section 16(b) of the Securities Exchange Act of 1934, a sale of corporate stock occurred when the seller placed the stock in escrow and the buyer made a substantial payment (14 percent of the total price) for an option to buy, which was to apply to the purchase price if the option were exercised. This court said at page 698:

"The circumstances of the transactions clearly indicate that the stock was effectively transferred, for all practical purposes, long before the exercise of the option. . . . The extent of [the option] payment represented, if not the exercise of the option, a significant deterrent to the abandonment of the contemplated sale. . . ."

A similar result was reached in Blau v. Allen, 163 F.Supp. 702 (S.D.N.Y. 1958). In the present case, the down payment of $150,000 represented more than 18 percent of the basic purchase price of $816,000 and more than 16 percent of the final adjusted price.[3]

date," the period would have ended on April 3, 1968.

3. The Illinois Supreme Court held in Crest Finance Co. v. First State Bank, 37 Ill.

2d 243, 250, 226 N.E.2d 369, 373 (1967), that a sale of corporate stock became an "irrevocable commitment" under Section 3–303(c) of the Uniform Commercial

In addition, the stock agreement here provided that until the closing date (1) no contract or commitment would be entered into by Premier other than normal commitments for the purchase of raw materials and supplies "except as may be first approved by Southwest"; (2) Premier would purchase all its corrugated sheet and other paper product requirements from suppliers, designated by Southwest; (3) Southwest would have full access "to all properties, books, contracts, leases, commitments and records of Premier" and to all information concerning the business and affairs of Premier as Southwest might request (Par. 9); (4) Southwest would advance additional working capital to Premier of up to $150,000 in cash or corrugated sheets under certain circumstances; and (5) Southwest could request Premier to install a corrugating machine and, if it did, would advance the required amount for a down payment (Par. 10).

Finally, the stock agreement as supplemented fixed the closing date (for the convenience of Southwest and its financial situation) as April 3, 1963 (Par. 4) and provided that the final purchase price would be enhanced by "interest on the amount so determined at the rate of 6% per annum from the Determination Date to the Closing Date" (Par. 2 as supplemented).

In view of the *Bershad* case and the provisions of the supplemented stock agreement, it could be argued that the sale of stock to Southwest occurred on September 28, 1961, a date earlier than that contended for by either side.

Other considerations are pertinent, however. In the first place, there are several provisions in the respective employment contracts themselves which throw considerable light upon the parties' intention.

Paragraph 2 of each employment contract provides, "The term of employment hereunder shall be a period of five (5)

years commencing on the Determination Date." A separate supplement was executed for each employment contract on February 13, 1963, which provided:

"NOW, THEREFORE, Premier and Employee hereby agree that the 'Determination Date' occurred on January 31, 1963, and that the term of employment of Employee with Premier under the Employment Agreement commenced on February 1, 1963."

All parties agree that the term of original employment of both Sharfsteins under their respective employment contracts was from February 1, 1963 through January 31, 1968.

The contract also states that if certain events occur "upon the expiration of this Employment Agreement" the employee will not compete "for a period of five (5) years following the termination of this Employment Agreement." The "expiration" and "termination" of the employment agreement could only be January 31, 1968. The language used by the parties does not permit any gaps between January 31, 1968 and the beginning of the second five-year non-competition period.

Southwest appeared to concede this, as did the district court when it found that the second five-year non-competition agreement ran from February 1, 1968 through January 31, 1973.

However, the court went on to find an "alternate" non-competition agreement running from February 1, 1968 through April 3, 1968. No language in any of the agreements supports this finding; it is clearly erroneous.

It is clear from a reading of the stock agreement and the employment contracts that the first five years' employment and the first five years of non-competition were concurrent and ran from February 1, 1963 through January 31, 1968. The second five years of employment and non-competition, if the period took effect, was

Code when the shares of stock had been delivered into escrow and the only remaining act to complete delivery to the

buyer was solely within the power of the buyer.

to run from February 1, 1968 through January 31, 1973.

Under Southwest's contention and the district court's findings, if upon the expiration of the first five years of employment, neither party was willing to continue the employment, the non-competition clause would nevertheless remain effective from February 1 through April 3, 1968, whereas if Southwest was willing to continue the employment but the Sharfsteins were not, the second period of non-competition would run from April 3, 1968 through January 31, 1973. In other words, although there would be two five-year periods of employment, the two periods of non-competition would be for (a) five years, two months and three days and (b) four years, ten months less three days. Obviously, the language used by the parties does not permit these verbal gymnastics. To find two equal periods of five years for both employment and non-competition is the only interpretation completely consistent with the language employed.

There are many other factors which point unmistakenly to the conclusion that the original periods of both employment and non-competition ended on January 31, 1968.

As noted before and as conceded by all parties, the stock agreement and the employment contracts were inextricably intertwined. Each refers to the other and the effectiveness of each is conditional upon the effectiveness of the other. Obviously, they must be construed together.[4]

The "Determination Date" under the stock agreement, as well as under the employment contracts, was fixed by the supplemental agreement of February 13, 1963 as January 31, 1963. As we have shown, it could be argued that the sale of Premier stock to Southwest took place on September 28, 1961, when the stock agreement was signed, the Premier stock deposited in escrow and $150,000 paid to Premier. However, because the purchase price was adjusted to include Premier's net earnings through January 31, 1963, the Premier shareholders recouped net profits through January 31, 1963. Robert Sharfstein testified (and there was no contrary evidence) that from September 28, 1961 through January 31, 1963, the net profits of Premier were received by, and corporate salaries were fixed by, the original Premier shareholders. After January 31, 1963, net profits accrued in Premier for the sole benefit of Southwest and corporate salaries were determined by Southwest.

Although the "Closing Date" was established as April 3, 1963, the delay was for the benefit and convenience of Southwest. The purchase price had been determined as of January 31, 1963; the Premier shareholders were paid 6 percent interest on the established price from January 31 to April 3, 1963.

At the closing, the parties further agreed that (1) the original shareholders would remain liable for the excess of uncollectable accounts receivable outstanding on January 31, 1963 over the reserve for doubtful accounts on January 31, 1963; (2) Premier would pay to the original shareholders collections on accounts receivable charged off as uncollectable prior to February 1, 1963; and (3) the original shareholders would remain liable for the excess of federal income tax deficiencies assessed up to January 31, 1963 in excess of the audited reserve for taxes as of January 31, 1963.

The relative importance of the determination date and the unimportance of the closing date is demonstrated by a comparison of two cases. In Stern v. Bristol Corp., 273 App.Div. 371, 77 N.Y.S.2d 324, aff'd, 298 N.Y. 766, 83 N.E.2d 463 (1948), the court dismissed a complaint on the ground that plaintiff failed to prove an agreement on all the terms essential to the contract. The court said (77 N.Y.S.2d at 328):

"One term essential to any such agreement to transfer a going hotel

---

4. Restatement, Contracts, § 235(c): "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together."

business through the transfer of all its stock is the date on which the financial status of the corporation is fixed by the parties for the purpose of such transfer. Without a definitive agreement on such date, plaintiff's syndicate could have no idea what assets they were getting and what liabilities, fixed and contingent, they were assuming; nor could defendants know what they were giving or getting in the transaction. The evidence fails to show even a claimed agreement on this indispensable term of the special type of contract alleged and relied on. . . ."

In Rainier v. Champion Container Co., 294 F.2d 96 (3rd Cir. 1961), the court of appeals distinguished the *Stern* case and held that a binding agreement for the sale of the capital stock of a corporation existed although no date was set for closing. The court said at page 101: "It is true that no date was set for closing but a reasonable time could be implied."

The "Determination Date" was more than a label. It was the determinative or effective date of the sale of the Premier stock to Southwest. This confirms our analysis of the contractual language that the original five-year periods of employment and non-competition both began on January 31, 1963 and both ended on January 31, 1968.

Although not necessary to the decision of this appeal, there is yet another reason why all the circumstances surrounding the Premier stock sale to Southwest point to our conclusion that the original non-competition period expired on January 31, 1968.

The Illinois courts have consistently held that contracts in general restraint of trade are void as against pub-lic policy and that a restraint is general if it applies to the entire state of Illinois. Hursen v. Gavin, 162 Ill. 377, 44 N.E. 735 (1896); Lanzit v. J. W. Sefton Mfg. Co., 184 Ill. 326, 56 N.E. 393 (1900); Andrews v. Kingsbury, 212 Ill. 97, 72 N.E. 11 (1904); Parish v. Schwartz, 344 Ill. 563, 176 N.E. 757 (1931); L & R Insurance Agency, Inc. v. McPhail, 92 Ill.App.2d 107, 235 N.E.2d 153 (1968).[5]

Paragraph 10 of the employment contracts here provides for non-competition "in any county in Illinois and adjoining states in which Premier has had sales and distributions." Although the evidence showed that 90 percent of Premier's sales were made within 50 to 100 miles of Chicago, there was no evidence that the restraint would not be applied to the entire state of Illinois.

However, the Illinois courts have recognized what they call an "in-term—post-term" distinction, that is, an otherwise unreasonably broad territorial restraint may be countenanced if it exists *during* the term of the employment or other pertinent agreement. Vendo Co. v. Stoner, 105 Ill.App.2d 261, 245 N.E.2d 263 (1969); Match Corp. of America v. Acme Match Corp., 285 Ill.App. 197, 1 N.E.2d 867 (1936); Guth v. Minnesota Mining & Mfg. Co., 72 F.2d 385 (7th Cir. 1934), cert. denied, 294 U.S. 711, 55 S.Ct. 506, 79 L.Ed. 1245 (1935); Ellis Electrical Laboratory Sales Corp. v. Ellis, 269 Ill.App. 417 (1933); Southern Fire Brick & Clay Co. v. Garden City Sand Co., 223 Ill. 616, 79 N.E. 313 (1906).

If the employment and non-competition periods were coexistent and coterminous, the restraints would fully comply with the Illinois law which the parties had in mind and expressly agreed would apply. If the contention of Southwest and the

---

5. The public policy was expressed in Union Strawboard Co. v. Bonfield, 193 Ill. 420, 427, 61 N.E. 1038, 1040 (1901): "It is against the policy of the state that its citizens should not have the privilege of pursuing their lawful occupations at some place within its borders, and that a citizen should be compelled to leave the state to engage in his business and to support himself and his family." Another aspect of the public policy is that the people of the state should not be totally deprived of its citizens' labors. Vendo Co. v. Stoner, 105 Ill.App.2d 261, 281, 245 N.E. 2d 263, 273 (1969).

findings of the district court were applied, the restrictive covenant would be invalid under Illinois law under the facts of this case. The Sharfsteins refused further employment after January 31, 1968, but the non-competition clause purportedly would continue for an additional five years. Even in the case of both sides' mutually agreeing to discontinue the employment, the non-competition covenant purportedly would continue to April 3, 1968. Illinois law does not permit such a result.

We therefore conclude from the language used by the parties, from the terms of the employment contracts and stock agreement, and from the context, background and circumstances of their dealings, that the first period of both employment and non-competition began on February 1, 1963 and ended on January 31, 1968.

## II

The next issue is whether a second period of employment and non-competition was created to begin on February 1, 1968 and to end on January 31, 1973.

Southwest representatives frankly admitted in their testimony that they tendered no written extensions or renewals of employment to either of the Sharfsteins on or prior to January 31, 1968.

On February 3, 1968, both Sharfsteins tendered their written resignations to Southwest effective immediately. They pointed out that the original employment contracts expired by their terms on January 31, 1968, but agreed to assist "in the orientation of my successor" for a short period.

On February 5, 1968, Raymond E. Baker, executive vice president of Southwest, wrote both Sharfsteins to confirm his telephone conversations of that day that Southwest was "willing to extend the original Employment Agreement . . . upon terms not less favorable to you than those provided in the original Agreement dated September 28, 1961." A longer letter containing substantially similar language was written to both Sharfsteins by Baker on February 7, 1968. The Sharfsteins each answered Baker by letter dated February 12, 1968, affirming their resignations. The employment of both Sharfsteins by Southwest ended on February 16, 1968.

It should be noted at the outset that Southwest is a "public" corporation with a board of directors of approximately 15 members. The stock agreement and supplemental agreement expressly provided that their execution had been authorized by a resolution of the board of directors or the executive committee of Southwest. The original employment contracts were executed by Premier through authorization of a resolution by its board of directors and were accepted by Southwest by its officers.

The employment contracts each provided for the payment of a basic salary of $400 per week plus 5 percent of the net earnings of Premier up to $100,000 and 7½ percent of net earnings in excess of $100,000. The employment contracts also provided that the second period of non-competition would arise "if upon the expiration of this Employment Agreement, Southwest is willing to extend the same terms not less favorable than those provided herein, and Employee shall be unwilling to do so, then for a period of five (5) years following the termination of this Employment Agreement." The words "not less favorable," of course, required that the profit sharing should also continue.

Illinois law is particularly adamant in requiring that option contracts be strictly construed and that an option be considered exercised only if the person holding the opting power adheres exactly to the conditions precedent to its effective consummation. Epton v. CBC Corp., 48 Ill.App.2d 274, 197 N.E.2d 727 (1964); Morris v. Goldthorp, 390 Ill. 186, 60 N.E.2d 857 (1945).

In Lake Shore Country Club v. Brand, 339 Ill. 504, at pages 521–522, 171 N.E. 494, at page 501 (1930), the Illinois Supreme Court said:

"An option contract is unilateral. . . . Because but one party is

bound thereby and the other is not, courts will exercise their discretion with great care in determining whether such a unilateral contract has been converted into a bilateral contract. . . . If conditions precedent to the right to convert a unilateral contract into a bilateral one are not met, the unilateral contract does not become bilateral. . . . An option contract is not a contract of sale within any definition of the term, and at best but gives to the option holder a right to purchase upon the terms and conditions, if any, specified in the option agreement. In order to avail himself of the right, the optionee must comply with the conditions set out in the option contract. . . .

"A court of equity cannot relieve the optionee from the effect of his failure to comply with the conditions on which he has been granted the privilege of buying."

■ It is also well settled under Illinois law that the president or other officer of a corporation has no authority, in the absence of action by the board of directors, to make on its behalf an unusual or extraordinary contract. It is also universally held under Illinois law that a contract to pay as compensation a percentage of the profits of a corporation is not the usual and ordinary contract which a person authorized to offer employment may make without specific authority of the corporation. Sacks v. Helene Curtis Industries, Inc., 340 Ill. App. 76, 86, 91 N.E.2d 127, 132 (1950).

■ There is no evidence in the record that the board of directors of Southwest or even its executive committee authorized *at any time* the hiring of the Sharfsteins for an additional five years after January 31, 1968 for compensation which necessarily would include the payment to them of a percentage of the profits of the corporation.

Southwest contends principally that it communicated its "willingness" to extend the contract when on June 7, 1967 J. B. Edens, then the president of Southwest, in response to a statement by Dunavin that the Sharfsteins "could tear up their contracts," reassured the Sharfsteins that Southwest "had no intention of tearing up the contracts." Edens testified that he orally told the Sharfsteins at that meeting "that we were going to continue to want them throughout the ten-year period." Both Sharfsteins testified that Edens told them that Southwest expected to live up to its contracts, but both denied that Edens mentioned any extension or renewal for the full ten-year period.

There are a host of conclusive reasons why, assuming that Edens did refer to a ten-year period, he did not exercise Southwest's option: (1) A statement that "we were going to continue to want them" does not comply with the strict Illinois requirement for exercising an option.[6] (2) Edens had no authority from his board of directors or executive committee. In fact, several officers of Southwest testified that it was Baker rather than Edens who had the requisite authority (with directors' approval) to renew the employment contracts. (3) Edens was speaking on June 7, 1967, eight months prior to January 31, 1968. What Southwest's "willingness" might be on June 7, 1967, has no relation to its willingness on the expiration date of January 31, 1968. (4) The terms were not even vague—they were completely unexpressed. (5) There was complete lack of mutuality of obligation: No one could seriously contend that the Sharfsteins could specifically enforce a five-year employment contract including

---

6. In Morris v. Goldthorp, 390 Ill. 186, 195, 60 N.E.2d 857, 861 (1945), the Illinois Supreme Court said: "It is elementary that where one party gives an option to another, the acceptance, to be valid so as to conclude an agreement or contract between the parties, must, in every respect, meet and correspond with the offer, neither falling short of, nor going beyond, the terms proposed but exactly meeting them at all points and closing with them just as they stand."

profit sharing because Southwest was "going to continue to want them."

In Bleck v. Cosgrove, 32 Ill.App.2d 267, 177 N.E.2d 647 (1961), the defendant had leased a golf course for many years and was in possession under a written lease which expired by its terms on December 31, 1958. The president of the club advised the defendant that if he undertook "major improvements" he would have a lease for 1959 and additional years "on the same terms as 1958." The defendant made the improvements, but the Illinois Appellate Court held that there was no binding lease beyond December 31, 1958 for three reasons: (1) The alleged agreement was nebulous, requiring "a sojourn into the field of clairvoyance" to ascertain its terms. (2) The defendant "could not have successfully prosecuted a suit for specific performance." (3) The alleged agreement was beyond the power of the president to bind the corporation because it was an unusual or extraordinary contract.

Edens also testified he had told Baker that "as far as I was concerned, we were going to extend the contract at the end of the five-year period." However, Baker did not communicate Edens' personal opinion on the subject to the Sharfsteins on or prior to January 31, 1968. Internal conversations within Southwest not communicated to the other contractual parties certainly cannot be considered an exercise of Southwest's option to extend the employment contracts.[7]

Southwest also contends that the fact that it raised the salaries of the Sharfsteins during the first five-year period somehow satisfied Southwest's obligation to take some action to exercise the option. The original employment contracts provided for basic salaries of $400 per week. In 1966, Southwest increased the Sharf-

steins' salaries to $500 a week and later in the year to approximately $600 per week to Richard and $635 per week to Robert. If anything, these increases complicated the situation. Baker testified that, when Southwest wrote letters on February 5 and 7, 1968 to the Sharfsteins stating that Southwest "is willing to extend the original Employment Agreements . . . upon terms not less favorable to you. . .," his intention was to continue the salaries at the increased rate. However, the letters themselves did not make this clear; it is doubtful that a contractual relation for the second five-year period could validly have been based on terms which did not specify the salary. But in any event the granting of the increases themselves obviously did not satisfy the Illinois requirements for creating the second period of employment.

One simple test to apply to those actions of Southwest which it contends constituted a sufficient demonstration of its "willingness" to renew is whether the Sharfsteins could have enforced a contract for the second five years against Southwest on the basis of those same actions. It is clear that they could not. For example, there were two parties other than the Sharfsteins to the stock agreement, Joseph Sislow and Marshall Stein, both of whom also received employment contracts identical to those of the Sharfsteins. Substantially the same manifestations of "willingness" to renew were demonstrated to Sislow and Stein. Nevertheless, Stein's contract was not renewed and his employment was terminated at the end of the first five years. Sislow's contract was renewed at $500 per week basic salary and he continued his employment.

In view of our conclusion that the Illinois requirements to extend the employ-

---

7. In Epton v. CBC Corp., 48 Ill.App.2d 274, 283, 197 N.E.2d 727, 732 (1964), the court commented on its earlier abstract opinion in Van Meter v. Downing, 345 Ill.App. 605, 104 N.E.2d 126 (1952), as follows:

"In that case we held that an allegation that the optionee was ready and willing to perform an option to purchase realty without alleging that such attitude had been communicated to the optionors was insufficient to show exercise or acceptance of the option so as to state a cause of action for breach of the option by the optionors who sold the realty to another before expiration of the option."

ment and non-competition agreements for a second five-year period were not met by Southwest, it is not necessary for us to determine whether the exercise of the options was required to be in writing.

The district court found, "Neither Robert nor Richard made inquiries at any time prior or subsequent to January 31, 1968, whether Southwest was willing to extend the employment agreement. . . ." There is nothing in the agreements between the parties nor in Illinois law which placed any burden on the Sharfsteins to instigate Southwest's exercise of its options.

Although there is implicit in the briefs of both sides the definite feeling that, without the intervention of Dunavin, the Sharfsteins would have been happy to continue their employment with Southwest and in any event would have initiated discussions leading to a renewal when Southwest failed to do so, these speculations about what courtesies the parties might have shown each other do not create any legal duties where none otherwise existed.

The record clearly reveals that the Southwest representatives simply overlooked the fact that the employment contracts expired on January 31, 1968. The fact that the Sharfsteins would have saved them from their neglect but for Dunavin does not even create a moral issue, much less a legal one. The Sharfsteins can argue that the Dunavin incident justified their arms' length attitude; legally they were under no burden to remind Southwest of the fifth anniversary of their economic marriage. If either side is morally chargeable with Dunavin, it should be Southwest.

We conclude that Southwest did not activate the second five-year period of employment and non-competition for Robert or Richard Sharfstein and that the first five years of contractual relations ended on January 31, 1968. Insofar as the district court's findings are contrary to this conclusion, they are clearly erroneous.

## III

The last issue is whether, as the district court stated in his judgment order, "the defendants have committed a legal wrong in connection with the hiring during the period February 3, 1968 through June 7, 1968 of a large number of Southwest's . . . key managerial and supervisory personnel."

We believe that the following finding of the district court is amply supported by the evidence and is correct (emphasis added):

"While they have employed former employees of the plaintiff they have not, except in the instances above noted, made any special offer to the former employees of the plaintiff that have become employed by the defendants. *Except for their agreement with plaintiff* their competitive actions in hiring former employees of plaintiff and otherwise have been fair and honorable."

Since the contract not to compete terminated on January 31, 1968, what occurred in the way of competition between February 3 and June 7, 1968 has no legal consequence, except for the fact that the Sharfsteins continued in the employment of Southwest until February 16, 1968. That fact necessitates consideration of what occurred up to the last date of employment to determine whether they breached their duty of loyalty as employees of Southwest.

The Sharfsteins were aware that Union Camp Corporation owned a corrugating plant located at 4545 West Palmer Avenue in Chicago. On January 25 or 26, 1968, Richard telephoned a Union Camp representative and learned that the plant was still available. On February 1 and 2, Richard met in New York with Union Camp representatives; tentative agreements were made for acquisition of the plant by the Sharfsteins. On February 3, the Sharfsteins submitted their written resignations to Southwest.

The agreement between Union Camp and the Sharfsteins was signed in New

York on February 7, 1968. On the same day, a charter was issued by the Illinois Secretary of State for Pride Container Corporation.

The sale of the Union Camp plant was subject to Federal Trade Commission approval, which was granted March 8, 1968. Union Camp gave the Sharfsteins permission to take possession on February 20, 1968, which they did. However, the plant had been closed for 18 months and needed a great deal of renovation. Pride began business operations on April 4, 1968.

In James C. Wilborn & Sons, Inc. v. Heniff, 95 Ill.App.2d 155, 163, 237 N.E. 2d 781, 786 (1968), the Illinois Appellate Court said:

"A review of the evidence indicates that the defendants merely exercised their right to leave one employment and form or join a rival business. Thus, this case is distinguishable from those cited by the plaintiff. The latter involve either the appropriation of a bona fide trade secret (e. g. Schulenberg v. Signatrol, Inc., supra) or a proven plot to destroy another's business (Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954)). The defendant, Heniff, did not violate his duty of loyalty to Wilborn by forming Brandex and purchasing machinery for it while working for Wilborn. It is not necessarily a breach of duty for an agent to form a rival concern and purchase machinery for it while working for his principal (see e. g. Greenberg v. S. D. Childs & Co., 147 Ill.App. 477 (1909)), though it would be for an agent to continue to work for his principal after a rival corporation which he also served as agent begins business. Heniff immediately left Wilborn when Brandex commenced business."

Since Pride commenced business subsequent to February 16, 1968, the Sharfsteins did not violate ther duty of loyalty to Southwest.

There is no claim here that any trade secrets were appropriated.

In January 1968, the Premier operation of Southwest employed about 200 persons. By April 3, 1968, 16 former Southwest employees had been employed by Pride. None of them was hired prior to February 16 nor as the result of solicitation by the Sharfsteins. Since they had all previously worked for the Sharfsteins at Premier, it is not difficult to imagine that they would want to transfer positions without urging or solicitation by the Sharfsteins. Hence, there was no "proven plot to destroy another's business."

We reverse the district court's judgment and remand the case with directions to enter judgment for the defendants.

PELL, Circuit Judge (concurring).

I concur in Judge Sprecher's opinion that the district court's judgment must be reversed with judgment to be entered for the defendants on remand.

I do, however, have some question as to whether the provisions pertaining to the second five years of noncompetition rise to the dignity of an option situation. See, e. g., Whitelaw v. Brady, 3 Ill.2d 583, 588, 121 N.E.2d 785 (1954). Southwest had no option right to further employment services. The most it could be opting for would be that the Sharfsteins would refrain from competing if Southwestern was "willing" to extend the employment contract for five years.

Irrespective, however, of nomenclature, Southwestern's willingness, as demonstrated in Judge Sprecher's opinion, must have been a legal willingness which it was not. A corporation may be enceinte with the ideas, hopes and intentions of its human representatives but when they involve a corporate commitment of the nature here involved, viability requires formal action which was not shown to exist. This is not a matter of communication. There was no corporate act of willingness in existence.

The Sharfsteins pointedly refrained from refreshing the memory of Southwestern as to the time for legalization of the willingness. Had they done so it may well have been that corporate action

would have been taken. I agree with Judge Sprecher that the Sharfsteins had no legal duty in this respect.

As hereinbefore indicated and principally for the reasons expressed herein, I concur in and approve of the result reached in Judge Sprecher's opinion.